Ted Poretz (TP 5387)
BINGHAM McCUTCHEN LLP
*Attorneys for Defendants*
399 Park Avenue
New York, NY 10022-4689

Telephone No.: (212) 705-7000

RECEIVED
APR 1 7 2006
U.S.D.C. S.D. N.Y.
CASHIERS

JUDGE SAND

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x

**SOUTH CHERRY STREET, LLC,**

              **Plaintiff,**

           **- against -**

**HENNESSEE GROUP LLC, ELIZABETH LEE**
**HENNESSEE AND CHARLES A. GRADANTE,**

              **Defendants.**

-------------------------------------------------------------- x

**06 CV 2943**

2006 CV _____ (  )

**COMPLAINT**

**TRIAL BY JURY**
**DEMANDED**

Plaintiff SOUTH CHERRY STREET, LLC, and through its attorneys, BINGHAM

McCUTCHEN LLP, as and for its Complaint against defendants HENNESSEE GROUP LLC,

ELIZABETH LEE HENNESSEE and CHARLES A. GRADANTE hereby recites the following:

**THE PARTIES**

1.    Plaintiff SOUTH CHERRY STREET LLC ("Cherry Street") is a Delaware

limited liability company having its principal place of business in Denver, Colorado.

2.    Defendant HENNESSEE GROUP LLC ("Hennessee Group") is, upon

information and belief, a limited liability corporation incorporated under the laws of the State of

New York. Hennessee Group maintains its principal place of business at 500 Fifth Avenue, New

York, N.Y. Upon information and belief, all of the members of Hennessee Group are citizens of states other than Colorado and Delaware.

3.      Defendant ELIZABETH LEE HENNESSEE ("Hennessee") is a natural person residing in the State and County of New York. Hennessee is a Managing Principal and control person of Hennessee Group.

4.      Defendant CHARLES GRADANTE ("Gradante") is a natural person residing in the State and County of New York. With his wife Hennessee, Gradante is a Managing Principal and control person of Hennessee Group.

## JURISDICTION AND VENUE

5.      This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs. In addition, the Third Claim for Relief is brought under the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78(t) and Rule 10(b)-5 thereunder. Accordingly, this Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1331. This Court has subject matter jurisdiction of the common law claims made here under applicable principles of supplemental jurisdiction.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a) because all defendants reside herein and are subject to personal jurisdiction and because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district. For the same reasons, venue is also proper in this judicial district pursuant to 28 U.S.C. §1391(b).

## INTRODUCTION

7.      South Cherry brings this action against Hennessee Group and its principals and admitted control persons, Gradante and Hennessee, to recover damages arising out of its

2

investments in Bayou Accredited Fund, L.L.C. ("Bayou"). As South Cherry has discovered, Bayou was a fraudulent and criminal investment scheme at all times since it first purchased Bayou securities in March, 2003. As South Cherry's investment advisor and hedge fund consultant, Hennessee Group had -- and breached -- both contractual and legal fiduciary obligations to South Cherry.

8.      Hennessee Group represented to South Cherry and to all its clients and prospective clients that it would not recommend a hedge fund investment to any client unless the hedge fund survived all five phases of a detailed and thorough due diligence process. It also represented that even after its clients made recommended hedge fund investments, Hennessee Group would perform an "on-going due diligence" process because such post-investment due diligence was as important as the due diligence that led to the investment. It was absolutely material to South Cherry in making all of its hedge fund investments, including its investment in Bayou, that Hennessee Group perform the rigorous due diligence process it promised. South Cherry made all of its hedge fund investments, including its investment in Bayou, in reliance on Hennessee Group's representation that it had conducted the full five level due diligence process as to all the hedge fund investments it recommended, and that all such hedge funds had passed all five levels of the process. Thus, when Hennessee Group recommended to South Cherry that it invest in Bayou, South Cherry relied on its recommendation, in part because of Hennessee Group's advertised expertise and familiarity with the complex world of hedge funds, but also because South Cherry trusted Hennessee Group not to have made that recommendation without Bayou first clearing all five levels of its rigorous due diligence process.

9.      Since the recent discovery that Bayou, and the other hedge funds in the same family of funds (the "Bayou Family Funds," including "Bayou" itself, as context warrants), were

3

fraudulent enterprises, and with the criminal convictions of Bayou's principals, Samuel Israel III ("Israel") and Daniel Marino ("Marino"), it has become clear that Hennessee Group did not remotely perform the promised pre-investment or post-investment on-going due diligence process as to Bayou. Indeed, it is possible that it did none at all.

10.    South Cherry is not the only Hennessee Group client to have invested in Bayou on Hennessee Group's recommendation. It has been widely reported in the news media that Hennessee Group clients, acting on Hennessee Group's recommendation, invested tens of millions of dollars in the various Bayou Family Funds. Hennessee Group, which advertised that it had ongoing relationships with hundreds of different hedge fund managers, has not explained why it recommended Bayou Family Fund investments to such a large and seemingly disproportionate segment of its clientele.

11.    Once the Bayou fraud was discovered and publicized, Hennessee Group continued to ignore its fiduciary obligations to its clients, and instead concentrated on protecting itself at its clients' expense. Its conduct was particularly troublesome in respect to South Cherry. Hennessee Group persuaded South Cherry to accept free legal representation from Hennessee Group's own law firm, ostensibly in order to bring a proceeding to freeze the assets of all the Bayou Family Funds. But, the strategy the law firm outlined was at all times highly unlikely to produce any real tangible result, especially since any freeze would be redundant of (and subordinate to) far more potent efforts already undertaken by state and federal law enforcement agencies. The real purpose of Hennessee Group's offer to South Cherry was to cause South Cherry to take a litigation position that would make it more difficult for South Cherry to claim damages from Hennessee Group.

4

## BACKGROUND

**A.**    **South Cherry is Introduced to Hennessee Group**

12.    In late 2000, South Cherry's agent, Craig Bollman ("Bollman") contacted Hennessee Group after reading about it in a financial publication. Sometime shortly thereafter, Bollman and Hennessee Group met at Hennessee Group's offices. At the meeting, Hennessee Group, through Gradante, Hennessee and others, described its services to Bollman. In its presentation to Bollman, Hennessee Group described itself as the "strategic partner in hedge fund investing" of its clients and emphasized that its clients were the investors, never the hedge funds. It sought to persuade Bollman to cause South Cherry to invest in hedge funds because, among other reasons, hedge funds consistently outperformed the S&P 500 Index through the period 1993 - 2000.

13.    Beyond pointing out the advantages of hedge fund investing in general, Hennessee Group sought to persuade Bollman of the specific advantages in hiring Hennessee Group as an investment advisor and hedge fund consultant to recommend specific hedge fund investments and portfolio allocations. Among other things, Hennessee Group represented that:

- it was an "Industry Leader: the most recognized hedge fund consulting firm in the industry," whose principals had testified before the United States Congress on hedge fund issues;

- its principals, Gradante and Hennessee, were "early pioneers in the [hedge fund] industry with over 40 combined years in the financial service industry;"

- it had "150 direct relationships with hedge funds," and reviewed 550 additional hedge funds every month; and

5

- its research was "internationally subscribed," and its proprietary Hennessee Hedge Fund Indices are "the oldest, most widely sourced hedge fund index in the financial industry."

14.    Hennessee Group told Bollman that it gave "value added" to its customers for a number of reasons, among them, its "credibility among managers, investors and industry professionals," its "discernment" and "business judgment," its extensive "professional network," its "asset allocation and manager selection process," its "ongoing and continuous qualitative and quantitative analysis" of the hedge funds it represents and, most important, its "unique due diligence process."

15.    Hennessee Group described its "unique due diligence process" in detail, underlining its importance to any hedge fund investor. This process was described as having five separate levels, that it evaluated all candidate hedge funds after each level of due diligence review, and that a hedge fund would have to pass <u>all five levels of due diligence review</u> before Hennessee Group would ever recommend the hedge fund to a client.  If the hedge fund did not pass any single level of the five level process, it would not be passed on to the next level of inquiry, and accordingly could not be recommended to a client under any circumstances.  There were certain bottom line requirements for a hedge fund even to enter the five level due diligence process.  One of these was the requirement that the hedge fund must have "three years audited track records" in order even to be eligible to enter the first level of Hennessee Group's due diligence process.  As discussed in more detail below, Bayou did not meet this test.

16.    For those hedge funds that passed the first level of due diligence review, Level Two of the Hennessee Group due diligence process included, among other things, an assessment of the hedge fund's "experience," and "credibility," and also sought to assess its "transparency."

6

As discussed below, Bayou was anything but "transparent," and it objectively failed this second level of review.

17.     For those hedge funds passing Level Two Review, Level Three review required, among other things, a face-to-face meeting at the hedge fund's offices so that Hennessee Group personnel could "interact with [hedge fund] Personnel from the top down to develop an impression of overall professionalism, attitude and depth of organization," and to help Hennessee Group assess the hedge fund's systems," training," "risk Management," "personnel," "culture," "environment" and "organization" and "philosophy." Bayou could not objectively have passed this level of review, and documents Hennessee Group provided to another Bayou investor suggest that it did not have a face-to-face meeting with Bayou's personnel, if at all, until long after it recommended a Bayou investment to South Cherry, and long after South Cherry made the recommended investment.

18.     For those hedge funds that survived Level Three due diligence, Hennessee Group represented that at Level Four, it studied the hedge fund's "individual positions," with an emphasis on its long, short, cash and derivative positions, as well as any "off balance sheet transactions." Level Four due diligence also required a review of the "beta, market capitalization and trade days of portfolio," all factors in determining the degree of risk, or volatility in the hedge fund's investments. If Hennessee Group had studied Bayou's positions, or the positions of any other of the Bayou Family Funds, it would have learned, as the Securities and Exchange Commission (the "SEC") did, that neither Bayou nor any of the Bayou Family Funds were profitable, that its performance figures were all false, and that Israel and Marino had diverted a substantial portion of the monies they received from Bayou Family Fund investors into investments held in their own names, not in the name of any Bayou Family Fund.

7

19.    Finally, for those hedge funds which made it past the first four levels of due diligence, Hennessee Group a candidate hedge fund must also pass yet another level of review. Hennessee Group's fifth level required a review of "audited financial statements," as well as a reference check for the hedge fund's key personnel, confirmation of the hedge fund's prime banking relationship, and contact with the prior employers of the fund's key employers. Hennessee Group also promised that it would "verify" the hedge fund's auditors.  In addition, Hennessee Group reserved the option to retain a private investigative agency to perform additional due diligence as circumstances warranted.  Upon information and belief, Hennessee Group did none of this.

20.    Finally, Hennessee Group represented that it conducted a "disciplined," "On-Going Due Diligence" process, which, it represented, was "equally important" to the pre-investment due diligence process.   Given the extent of Hennessee Group's promised pre-investment due diligence process, South Cherry reasonably believed that Hennessee Group would be equally vigilant in policing its investments on an on-going basis.  Among other things, Hennessee Group's "on-going due diligence" scrutinized the hedge fund's performance figures and it continued to review audited financial statements on a continuing basis.  The process particularly looked for "style drift" -- any variation from plan in a hedge fund's investment activities.

21.    In subsequently determining to invest five million dollars ($5,000,000) in hedge funds recommended by Hennessee Group, Gradante and Hennessee, and specifically in determining to invest the gross amount of $2.9 million in Bayou, it was absolutely material to South Cherry -- which was otherwise inexperienced in hedge fund investing -- that Hennessee Group have conducted a "disciplined," and complete due diligence process on all recommended

8

investments in hedge funds. Absent Hennessee Group's representation that it conducted the detailed five level due diligence process, and the post-investment on-going due diligence process set forth in Hennessee Group's literature and elsewhere, South Cherry would not have opened a Hennessee Group account, and would not have invested any hedge fund recommended by Hennessee Group, including Bayou.

**B.     Hennessee Group Recommends Hedge Funds to South Cherry**

22.     In reliance on Hennessee Group's representations, South Cherry asked Hennessee Group to recommend a specific portfolio of hedge fund investments. At a presentation given on or about August 27, 2001, Hennessee Group recommended a portfolio of hedge fund investments, whose object was to "out perform a 'traditional' equity/bond portfolio of 70% equities and 30% bonds … while maintaining an equal level of risk …."

23.     Of the twenty-two investment styles that Hennessee Group claims to have monitored, Hennessee Group recommended these five investment different styles as specifically suitable to South Cherry:  a) growth, b) event-driven, c) technology, d) convertible arbitrage and e) opportunistic. Hennessee Group recommended that South Cherry invest $1,000,000 in each of these investment styles, with one hedge fund investment per investment style. Bayou, whose predecessor fund had been in business since 1996, was not among the hedge funds that Hennessee Group recommended at that time.

**C.     Hennessee Group Recommends that South Cherry Invest in Bayou**

24.     Bayou was formed on or about January 2003 following the decision of Israel and Marino to replace Bayou Fund, LLC ("Bayou Fund"), their original hedge fund. Bayou Fund had been formed in 1996, and had consistently lost money. In order to hide that fact, in approximately 1998, Israel and Marino fired Bayou Fund's original -- and well-respected --

9

hedge fund auditor, Hertz Herson & Co. ("HHCO") and replaced it with a fake, but purportedly independent, accounting firm, Richmond, Fairfield & Associates ("Richmond-Fairfield"). Richmond-Fairfield's name was an amalgam of the counties in which Marino had lived. Even though HHCO stopped auditing Bayou Fund in 1998, and never audited any of the Bayou Family Funds once they were established in 2003, Hennessee Group represented to South Cherry that Bayou, and the Bayou Family Funds, were audited by HHCO, a fact intended to buttress the credibility of these funds to knowledgeable investors. Hennessee Group made the same representation to at least one other of its clients, DePauw University, much later.

25.    If Hennessee Group had taken any steps to "verify" Bayou's auditors, as it promised, it would have discovered that HHCO no longer worked for any of the Bayou Family Funds, and had not done so in many years. It would also have discovered the existence of Richmond-Fairfield, and the fact that its registered principal -- in a public filing readily accessible to anyone caring to look -- was Marino, who was also an accountant. Even if Hennessee Group had known that Richmond-Fairfield, the fake auditing firm, at least purported to be auditing Bayou, any rudimentary due diligence would have turned up the fact that Marino was Richmond-Fairfield's "auditor" and thus could not possibly have been independent.

26.    Notwithstanding the fact that (a) Bayou Fund had lost money consistently since its establishment; (b) Bayou Fund had fired a well-regarded hedge fund auditor and replaced it with an unknown and blatantly phony entity whose illegitimacy would have been revealed by a simple check of public records, (c) South Cherry had already made a different investment in an opportunistic investing style of hedge fund recommended by Hennessee Group, making a second opportunistic hedge fund investment unsuitable, and (d) Bayou had no track record, let alone the three-year audited track record that was a *sine qua non* for Hennessee Group even to begin its

10

ostensibly rigorous five level due diligence process, Hennessee Group recommended to South Cherry that it invest in Bayou shortly after it was founded.

27.    In recommending an investment in Bayou to South Cherry, Hennessee Group represented in writing to South Cherry, among other things, that the predecessor Bayou Fund had been launched in January 1997, that it had a greater than 19% annualized return since inception, that it was profitable in 78% of the months since its inception, and that it had accomplished all of this at relatively low risk relative to the broader marketplace. All of these statements were false, and Hennessee Group, in the exercise of the due diligence it promised -- or any reasonable program of due diligence -- would readily have discovered the falsity of these representations. In fact, Bayou had consistently lost money trading in securities and options, and created trading profits out of whole cloth in order to mask that fact. Any review of Bayou Fund's positions would have revealed this.

28.    It was impossible for the newly formed Bayou to have had three years of audited financial statements, even if Bayou employed an actual auditor. And, even the simplest due diligence -- a telephone call to HHCO -- would inevitably have led to the discovery that it had not audited Bayou Fund in years, and was not Bayou's auditor. Hennessee Group did not take this elementary step, in violation of its representations to South Cherry and its agreement to conduct thorough due diligence. And, when it claims to have learned, far later on, that Richmond-Fairfield -- a firm with which Hennessee Group could not have been familiar, given its fraudulent nature -- Hennessee Group did nothing to "verify" Richmond-Fairfield's *bona fides*. On information and belief, Hennessee Group never had any contact directly with Richmond-Fairfield. It did not discover the fact that Marino was listed as Richmond-Fairfield's principal, a fact that alone should have raised profound red flags. It did not even ascertain

11

whether there was an auditor named Richmond, or an auditor named Fairfield, names that a diligent investigator might have recognized as names of counties and not accountants. And, when Hennessee Group was warned that Richmond-Fairfield was a fraudulent operation, it did not act diligently in response. In sum, had Hennessee Group taken any steps to "verify auditors," as it agreed, it would have ascertained that Richmond Fairfield was not a genuine auditor, that it was not independent, and that it never did any auditing. Instead, more than eight months after Hennessee Group told South Cherry that HHCO was Bayou's auditing firm, it continued to make the same misrepresentation to others.

29.     As part of its investment recommendation to South Cherry, Hennessee Group also provided it with six years of monthly performance figures for Bayou Fund. Net of all fees, Hennessee Group represented to South Cherry that Bayou Fund's annual performance between 1997 and 2002 ranged from a 7.05% gain in 2001 to a 21.04% gain in 1999 to a high water gain of 32.52% in 1997. The SEC, which has brought proceedings against all of the Bayou Family Funds, reports that Bayou Fund in fact lost millions of dollars in every single year it traded. The figures Hennessee Group provided to South Cherry were all false, showing profits where there were instead large losses. Having done no real due diligence into these figures (or they would have discovered that there was no genuine auditor), Hennessee Group had no reasonable basis to credit them and were accordingly grossly negligent in passing them on to investors like South Cherry.

30.     Hennessee Group also prepared and provided to South Cherry a purported "Biography" of Bayou's "Founder & Principal," Israel. Among other things, the Hennessee Group biography of Israel represented that "from 1992 to 1996, Israel was "head trader for Omega Advisors, managing assets exceeding $4 billion for Leon Cooperman," and that at

12

Omega, Israel "was responsible for all equity and financial futures execution, and shared responsibility for hedging the portfolio using futures and options." The representation that Israel was "head trader for Omega Advisors" was particularly impressive; Omega Advisors is one of the hedge fund industry's largest and most successful funds, and Leon Cooperman is widely described as a "legendary" trader. South Cherry relied on this description of Israel's background in determining to purchase Bayou securities.

31.    Hennessee Group's biography of Israel was false. Israel was never "head trader" for Omega Advisors, and never held any position remotely comparable. Any reference check -- one of Hennessee Group's promised due diligence tools -- would have revealed this. Given Hennessee Group's claim to cover the entire hedge fund industry, it is likely that Hennessee Group knows Leon Cooperman and could have called him. Indeed, one of the hedge funds in which South Cherry invested at Hennessee Group's suggestion, was Cobalt Partners, L.P., a fund managed by Leon Cooperman's son. Leon Cooperman has since described Israel as a mere "order taker," and it is likely that if Hennessee Group contacted him, he would have given the same information to Hennessee Group. In breach of its agreement and its fiduciary obligation, and with gross and willful negligence, Hennessee Group performed either no background check on Israel or Bayou, or performed a woefully deficient one in which it failed to take obvious investigative steps and ignored clear red flags. Hennessee Group's representation to South Cherry that it had performed a careful due diligence background check and reference check of Israel -- a representation it separately made in writing to DePauw University (and potentially to others) -- is plainly false.

32.    In reliance on Hennessee Group's recommendation, and in specific reliance on its understanding that Bayou had passed all stages of Hennessee Group's due diligence process,

South Cherry invested $2.9 million in Bayou over the period March 3, 2003 through June 1, 2003 in three separate investments. In the Spring of 2004, South Cherry withdrew $1.75 million of this amount, but on or about October 5, 2004 -- long after Bayou had ceased even the pretense of trading securities -- South Cherry invested another $900,000 in Bayou for a total net investment of $1.15 million.

33.     During this time period, South Cherry continued to be an investor in Bayou in reliance on Hennessee Group's promise that it would conduct on-going due diligence on Bayou. Indeed, during the period from its first investments until the Spring of 2005, Hennessee Group mailed regular reports, entitled "Manager Performance Monitor" to South Cherry, which confirmed South Cherry's belief that Hennessee Group was conducting the on-going due diligence it promised. Just before Bayou's fraud was discovered, Hennessee Group reported to South Cherry that its $1.15 million had appreciated to approximately $1.5 million

34.     None of the Manager Performance Monitor reports disclosed the fact that Bayou was a fraudulent scheme, that its performance figures were all fictitious, that Bayou had lost money while it was still actually trading securities, that there had been no audit of Bayou, the Bayou Family Funds, or of Bayou Fund in at least the past five years. Indeed, the SEC revealed in September 2005 that beginning in 2003, Israel and Marino began to divert money from all of the members of the Bayou Family Funds, in order to invest the funds in private placements of non-public start-up companies under their own names or the names of newly formed partnerships in which Bayou investors had no interests. None of these misappropriations were disclosed by Hennessee Group to South Cherry in its on-going post-investment due diligence.

35.     The SEC has also revealed that as of April 2004, Israel and Marino essentially stopped trading in Bayou's accounts, and instead wired all of its remaining assets, and the assets

of the other Bayou Family Funds funds, into the Citibank account of another company from which Israel and Marino began to invest these funds, totaling approximately $150 million, in a variety of fraudulent prime bank or Ponzi scheme investments. Hennessee Group did not report any of this to its customers, even though a review of the statements from Bayou's prime banker, or other brokerage firms, would have disclosed that Bayou had stopped trading and had drained its accounts. Upon information and belief, Hennessee Group never reviewed Bayou's prime brokerage statements. Yet long after Bayou stopped even the pretense of trading -- and long after other hedge fund consultants advised their clients to withdraw their investments in Bayou or the Bayou Family Funds -- Hennessee Group continued to express positive views of Bayou, as a result of which South Cherry invested another $900,000 in Bayou securities in October 2004.

### D.    The Fraud is Discovered

36.    On or about July 27, 2005, Israel wrote to all investors in the Bayou Family Funds, including South Cherry, stating that all of the Bayou Family Funds would be liquidated, with ninety percent of the clients' capital balances to be distributed by August 12, 2005 and the balance to be distributed by the end of August. None of the Bayou Family Funds made the promised distribution -- or any distribution -- by the promised date, or since. and the SEC has since discovered that Bayou's accounts were overdrawn before the distribution checks were to have been paid.

37.    Subsequent to the Bayou correspondence set forth in the preceding paragraph, various federal and state investigations into Bayou's activities were commenced. Israel and Marino were subsequently indicted and pleaded guilty to charges of securities fraud. Lengthy prison sentences for both are expected. The Arizona Attorney General discovered approximately $101 million that had been wire transferred repeatedly among different banks around the world,

15

and caused that money -- understood to be almost one-fourth of the monies invested in the Bayou

Family Funds -- to be frozen pending further proceedings. Other monies were found to be

invested in risky and speculative investors by investment entities owned by Marino and Israel,

but in which Bayou Family Fund investors like South Cherry had no interest. The Department of

Justice and other law enforcement agencies report that they are seeking to forfeit these assets, to

the extent they can be located and profitably seized.

### E.    The Hennessee Group Cover-Up

38.    When Bayou did not make the distribution payments by the date promised, the

Hennessee Group communicated with its clients, including South Cherry. In a letter mailed to

clients dated September 1, 2005, Hennessee Group represented that when the distribution

payments did not arrive, it sought to contact Israel and Marino, and when it was unable to speak

with either of them, it "immediately initiated[d] an investigation." Pursuant to its alleged

investigation, Hennessee Group claims to have gone first to Bayou's offices, found them closed,

and then went to the offices of Richmond-Fairfield, hoping for a meeting with "Mr. Richmond,"

only to be told he was not in his office. Hennessee Group asserts that it then contacted law

enforcement authorities and, "with the assistance" of South Cherry, brought an action in the

Supreme Court of the State of New York, County of New York, seeking to freeze all of Bayou's

assets.

39.    In fact, Hennessee Group offered South Cherry, at no charge, the services of its

own attorneys. South Cherry accepted this offer believing, as Hennessee Group had told it, that

the attorneys Hennessee Group supplied would be acting in South Cherry's interests, not

Hennesse Group's. Though the attorneys did not obtain the requisite written engagement letter,

the attorneys provided to South Cherry drafted a Complaint against Bayou and related entities, as

16

well as an affidavit to be executed by South Cherry's principal, Fred Groothuis ("Groothuis"), in support of a temporary restraining order seeking to freeze all of Bayou's assets. The Arizona Attorney General had long before frozen the $101 million discussed above.

40.    Though it is unclear why Hennessee Group's attorneys believed a New York State temporary restraining order might be more effective than the worldwide freeze efforts already undertaken by the U.S. Department of Justice and the Federal Bureau of Investigation, South Cherry cooperated with them. The attorneys drafted an affidavit for Groothuis to execute that said, among other things, that Groothuis decided to invest in Bayou "in large part on reliance on the [Bayou] Fund documents ...." The Complaint that the attorneys simultaneously drafted also set forth that South Cherry's investment in Bayou was made in reliance on "representations in the offering documents" of Bayou.

41.    In fact, as Groothuis told the attorneys, South Cherry was never provided with any meaningful opportunity to review Bayou's offering documents. It invested in Bayou solely in reliance on Hennessee Group's recommendation, on the documents Hennessee Group created and provided to South Cherry, and on the due diligence Hennessee Group represented that it had conducted. As Hennessee Group, and therefore the attorneys it was directing, knew, it did not rely on any Bayou "offering documents." This statement, which was unnecessary to the freeze application, served Hennessee Group, not South Cherry.

42.    South Cherry respectfully submits that the attorneys undertook to appear on South Cherry's behalf notwithstanding the existence of a plain and glaring conflict of interest. The attorneys knew, or should have known, that South Cherry had potential claims against Hennessee Group for breaching its contractual and fiduciary obligations to South Cherry, yet chose to represent Hennessee Group and South Cherry simultaneously without even revealing the conflict

17

to South Cherry. The pleadings and an affidavit drafted by the Hennessee Group-supplied attorneys served to make it more difficult for South Cherry later to assert claims against Hennessee Group.

43.    Hennessee Group's attorneys successfully obtained an *ex parte* temporary restraining order (the "TRO") from the New York State Supreme Court purporting to freeze all of Bayou's assets. Inexplicably, though the TRO is unenforceable outside New York State, the attorneys then proceeded to serve the Court's temporary restraining order on dozens of financial institutions in other states and abroad, all jurisdictions where the attorneys could not reasonably have thought the state court's injunction would be effective. Not surprisingly, the out-of-state TRO recipients all rejected the TRO, and no assets are understood to have actually been frozen by virtue of the TRO.

## FIRST CLAIM FOR RELIEF AGAINST HENNESSEE GROUP
### (Breach of Contract)

44.    South Cherry repeats and realleges each and every allegation contained in paragraph nos. 1 through 43 as if fully set forth herein.

45.    By reason of the foregoing, Hennessee Group has breached its contractual obligations to South Cherry.

46.    South Cherry has been damaged thereby.

## SECOND CLAIM FOR RELIEF AGAINST HENNESSEE GROUP
### (Breach of Fiduciary Duty)

47.    South Cherry repeats and realleges each and every allegation contained in paragraph nos. 1 through 46 as if fully set forth herein.

48.    By virtue of the foregoing, Hennessee Group has breached its fiduciary duty as South Cherry's investment advisor.

18

49.    South Cherry has been damaged thereby.

## THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
### (Violation of Rule 10(b))

50.    South Cherry repeats and realleges each and every allegation contained in paragraph nos. 1 through 49 as if fully set forth herein.

51.    By the use and means and instrumentalities of interstate commerce or of the mails, in connection with South Cherry's purchase of interests in Bayou, Hennessee Group knowingly or recklessly (a) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (b) engaged in acts, practices, and/or a course of business that operated or would operate as a fraud or deceit upon South Cherry. In doing so, Hennessee Group violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78(j)(b) and Rule 10(b)5 promulgated thereunder, 17 C.F.R. §240.10b-5.

52.    By the time Hennessee Group was recommending that South Cherry make its last investment, an investment of $900,000 made on or about October 5, 2004, Bayou had lost any vestige of pretense that it was buying and selling securities, as it and Hennessee Group had represented. At that time, and at all times South Cherry purchased Bayou securities, Bayou was nothing more than a fraudulent investment scheme.

53.    South Cherry has been damaged thereby.

54.    Gradante and Hennessee are Hennessee Group's principals and personally participated in the making of the statements or omissions set forth above. They are -- and Hennessee Group's Form ADV admits they are -- control persons of Hennessee Group and

NYDOCS/1240924 2

accordingly they are jointly and severally liable for South Cherry's losses to the same extent as Hennessee pursuant to 15 U.S.C. §78t.

## JURY TRIAL

Trial by jury is hereby demanded.

**WHEREFORE**, South Cherry respectfully demands judgment as follows:

**ON THE FIRST CLAIM FOR RELIEF**, for judgment in favor of South Cherry and against Hennessee Group in an amount to be determined at trial, but in no event less than one million one hundred and fifty thousand dollars ($1,150,000.00); and

**ON THE SECOND CLAIM FOR RELIEF**, for judgment in favor of South Cherry and against Hennessee Group in an amount to be determined at trial, but in no event less than one million one hundred and fifty thousand dollars ($1,150,000.00); and

**ON THE THIRD CLAIM FOR RELIEF**, for judgment in favor of South Cherry and against defendants, jointly and severally, in an amount to be determined at trial, but in no event less than one million one hundred and fifty thousand dollars ($1,150,000.00); and

punitive damages in the amount of no less than one million dollars ($1,000,000.00), interest at the statutory rate, taxable costs and disbursements, reasonable attorneys' fees, and for such other and further relief as to this court may seem just and proper.

Dated:  New York, New York
        April 12, 2006

Respectfully submitted,

Ted Poretz (TP-5387)
BINGHAM McCUTCHEN LLP
*Attorneys for Plaintiff*
399 Park Avenue
New York, N.Y. 10022
(212) 705-7412

20