UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

IN RE BAYOU HEDGE FUND INVESTMENT                06 MDL 1755(CM)
LITIGATION

-------------------------------------------------------------------X

THIS DOCUMENT RELATES TO:

-------------------------------------------------------------------X

SOUTH CHERRY STREET, LLC,

                                Plaintiff,

                                                        **REPORT AND**
            -against-                                   **RECOMMENDATION**
                                                        **06 Civ. 2943(CM)(MDF)**

HENNESSEE GROUP, LLC, ELIZABETH LEE
HENNESSEE, and CHARLES A. GRADANTE,

                                Defendants.

-------------------------------------------------------------------X

TO:    THE HONORABLE COLLEEN McMAHON, U.S.D.J.

        Pending before the Court is Defendants' motion to stay the above captioned action and

to compel arbitration to resolve the differences between the parties.  This matter was referred to

me by your Honor's August 23, 2006 order for a report and recommendation concerning the

existence or non-existence of, and the scope of, any agency relationship between South Cherry

Street, LLC ("South Cherry") and Craig Bollman.

        As directed in your Honor's order of reference, this Court conducted a hearing on

September 21, 2006 for the purpose of finding the facts necessary to enable the Court to

determine what Bollman's relationship was to South Cherry and whether South Cherry Street

1

can fairly be said to have been acting through Bollman in his execution of the Investment Advisory Agreement ("IAA" or the "agreement"), which contained the arbitration clause at issue. Your Honor had determined, based upon review of the papers submitted on this application, that testimony from Bollman; Fred Groothius, the principal of South Cherry; and Charles Gradante, a defendant in this action and principal of defendant Hennessee Group, LLC ("Hennessee"), was necessary to decide the issue presented. The hearing testimony was completed on September 21, 2006. Although the parties were given an opportunity to submit further factual and legal arguments on the limited issue before me, both sides declined to do so.

### Factual Findings

As an initial matter, I note that the position taken by South Cherry on this application, denying that it was bound by the IAA, appears to be inconsistent with its position in the complaint, at least to the extent that the complaint's breach of contract claim is based on the IAA. Of course, that issue is not before me and it may well be that there is another agreement or theory of liability between the parties that has not been brought to my attention.

The following summarizes the evidence presented at the September 21, 2006 hearing:

South Cherry was formed in October 2000 for the purpose of acquiring a tenancy-in-common interest in HH Resorts Joint Venture. *See* Tr. at 11-12.[1] Craig Bollman, who Plaintiff refers to as its "agent" in the complaint, owned a controlling interest in Aristek Western Properties ("Aristek"). *See id*. at 103. Aristek, in turn, owned an interest in HH Resorts Joint Venture, which it subsequently transferred to Proteus Associates ("Proteus"), also controlled by Bollman. *See id*. at 14, 103. Proteus then made a "loan" to South Cherry by selling to it its

---

[1] Tr. refers to pages of the transcript of hearing held on September 21, 2006.

tenant-in-common interest in exchange for a promissory note in the amount of $14,750,000, upon which Proteus was to receive installment payments over a period of years. *Id*. at 135. As Bollman explained, this loan was not "a loan in the conventional sense of Proteus having . . . assets and loaning them." *Id*. As a result of this transaction, Proteus is a secured creditor of South Cherry. *See id*. at 135-36. Fred Groothius, a certified public accountant and tax advisor for Bollman and Proteus, *see id*. at 19, owns a 99% interest in South Cherry, *see id*. at 79. The remaining 1% is owned by South Cherry Street Investment Corporation ("SCSIC"), a Subchapter S corporation wholly owned by Groothius. *See id*. Groothius has check signing authority on the Proteus bank account. *See id*.

According to Groothius, South Cherry was established "to create an installment sales obligation, in a tax legal way . . . that would allow the installment sale reporting of the gain inherent in those properties, which was practically the entire amount of the $14 million." *Id*. at 16. From a tax perspective, the benefit to Bollman in structuring the South Cherry transaction in this fashion was to defer tax liability for the funds until each installment payment was made. *See id*. at 28-29. In order to secure the tax advantage, it was important to keep a "bright line" between Bollman and South Cherry. *Id*. at 29, 54. According to Groothius, "the tax structure is . . . dependent upon South Cherry Street being independent from Mr. Bollman." *Id*. at 28.

While paragraph 12 of the complaint states that Bollman was South Cherry 's "agent," at the hearing, Groothius testified that Bollman was an agent only in the "colloquial sense" and that he "was authorized to do nothing on behalf of South Cherry." *Id*. at 20. When asked what made him a "colloquial agent," Groothius replied, "In the sense that, that he would look at investment opportunities, that then he might make recommendations to me; in that sense of the word, he was

an agent." *Id*. at 20-21.  He further stated that Bollman never made investments directly on

behalf of South Cherry.  *See id*. at 22-23.    Bollman, however, made more than twenty

investment recommendations to Groothius over a five-year period, some of which Groothius

acted upon and others which he did not.  *See id*. at 24.

Bollman confirmed that, on August 4, 2001, he signed the IAA, which contained the

arbitration clause.  *See* Ex. O.[2]  At the time he signed the agreement, he did not understand that

he had any authority to bind South Cherry or that he was acting on its behalf.  *See* Tr. at 115,

121.  The opening paragraph of the IAA states that it is between Hennessee and

> Mr. Craig Bollman; and all other entities, that may invest in hedge funds, for
> which Mr. Craig Bollman is authorized under the terms of any applicable plan,
> trust, partnership agreement or other governing instrument and by any applicable
> law to retain Hennessee and to make investments in hedge funds (collectively
> "Client").

Ex. O.  Exhibit B to the IAA, dated  August 4, 2001[3] and entitled "Accredited Investor Status,"

sets forth twelve descriptions of "Accredited Investors" as defined in the Securities Act of 1933

Rule 501(a) and asks the maker to initial those that apply to the Client.  *Id*.  Bollman checked off

two categories, both of which identify him as an individual investor with a certain specified

income and net worth.  *See id*.  More significantly, he did not initial any category relating to a

corporation or entity, even one in which all of the principals were themselves "Accredited

Investors."  *See id*.; Tr. at 133-34.  In the "Accredited Investor Profile," attached as Exhibit C to

the IAA and executed on August 4, 2001, Bollman identified himself as the sole decision maker

---

[2]  Citations to exhibits refer to items admitted into evidence at the September 21, 2006
hearing.

[3]  The 2002 date on the document was in error and was corrected to read 2001 at the
hearing.  *See* Tr. at 114.

with respect to hedge fund investments and further stated that he would be investing only on behalf of himself and no one else. *See* Ex. O; Tr. at 133-34. Notably, this appendix to the IAA discloses no relationship with any entity on whose behalf Bollman is authorized to "retain Hennessee to make investments in hedge funds." Ex. O.

Pursuant to the IAA, Bollman received investment advice from Hennessee and, through Proteus, invested in hedge funds recommended by Hennessee, including Sage Opportunity Fund. *See* Tr. at 111. However, according to Bollman and Groothius, Proteus's investment was separate from the investments made by South Cherry. Groothius was aware of the existence of the written IAA and he saw an unsigned copy, but never a signed copy. *See id.* at 21.

Both Groothius and Bollman testified that there was no document by which South Cherry or SCSIC authorized Bollman, individually or through an entity, to retain Hennessee or to invest in hedge funds for South Cherry. *See* Tr. at 82, 131. Both witnesses also stated that Bollman had never made any such investments for South Cherry. *Id.* Additionally, Groothius testified that Bollman had never been an employee of either South Cherry or SCSIC. *See id.* at 79-80, 130. Bollman, as an owner of Proteus, "was an indirect secured creditor" of South Cherry. *Id.* at 115. He discussed hedge fund investments with South Cherry and disclosed to Groothius the investment recommendations made by Hennessee. *See id.* at 116-17. South Cherry ultimately made investments in the following hedge funds recommended by Hennessee: West Broadway Partners, Cobalt Partners, Bricoleur Partners II, and Bayou Accredited Fund. *See id.* at 22, 30. According to the uncontradicted testimony of Bollman and Groothius, South Cherry's decision to invest in these funds was made by Groothius. *See id.* at 17, 133-34. It is worth noting that, while Bollman's sharing of Hennessee's investment advice with Groothius and South Cherry

5

may have violated the non-disclosure of proprietary information provision of the IAA, *see* Ex. O at p. 10, there is no question that all of the fees to which Hennessee was entitled due to purchases made by South Cherry were paid, *see* Tr. at 154.   I further note that the subscription agreement for the purchase by Proteus of an interest in Sage Opportunity Fund was signed by Craig Bollman.  *See* Ex 2; Tr. at 84.  Moreover, the subscription agreements for South Cherry's investments in Cobalt Partners, West Broadway Partners, and Bayou Accredited Fund all bear Groothius's signature.[4]  *See* Exs. 3-5; Tr. at 85 -89.  The subscription documents, however, went directly to the various fund managers and Hennessee did not routinely receive copies.  *See* Tr. at 183-84.

At the hearing, Groothius explained that the person with whom he exclusively dealt at Hennessee was an analyst by the name of Leeana Piscopo.[5]  *See id*. at 25.  In 2000, Piscopo was a Senior Research Analyst for Hennessee whose main responsibility was client servicing.  *See id*. at 140.  By 2003, she was listed by Hennessee as a Vice President and Company Compliance Officer.  *See id*. at 174.  According to Groothius, he explained to Piscopo in August of 2001 the need for maintaining "a bright line" between Bollman and South Cherry.  *See id*. at 30.  He testified that she understood "that I [Groothius] owned South Cherry Street and that . . . these investments were not being made by Mr. Bollman or by any entity that Mr. Bollman owned or controlled."  *Id*.  Groothius further stated that he conferred with Piscopo about every fund before

---

[4]  The subscription documents for South Cherry's investment in Bricoleur Partners II were not admitted into evidence.

[5]  Although there was significant testimony by Groothius of his conversations with Leeana Piscopo and some of her computer note entries were admitted into evidence, she was not called as a witness by either party.  No explanation for her absence was given in response to my inquiry as to whether she would be called to the stand.

investments were made. *See id*. at 25, 31, 34.

    For the hedge fund purchases made by South Cherry, fees of 1% of the purchases were billed by invoices sent to Bollman, which were then paid by checks drawn on Proteus's account and signed by Groothius, who had check signing authority on that account. *See id*. at 62. On these checks, Groothius made an entry memo "South Cherry LLC" to direct the bookkeeper to charge the fee back to South Cherry. *See id*. at 64. Groothius, however, never notified Piscopo or anyone else at Hennessee that the investments in question belonged to South Cherry and not to Bollman or Proteus. *See id*. at 62-63, 76.

    On December 6, 2000, Bollman attended a presentation by Hennessee regarding investment opportunities. *See id*. at 105. Prior to the presentation, Bollman had never mentioned South Cherry's existence to anyone at Hennessee and did not mention South Cherry at the presentation. *See id*. at 107, 109. However, Bollman testified that, after September 1, 2001, when Proteus invested in Sage Opportunity Fund, he disclosed to Hennessee, specifically to Leeana Piscopo, that some of the hedge funds listed to his account with Hennessee were actually owned by South Cherry and that some subsequent investments would most likely be made by South Cherry. *See id*. at 122-23; Ex. 2. Bollman also told Piscopo, on a number of occasions, that Groothius was his accountant and described to her what Groothius's responsibilities were at South Cherry. *See* Tr. at 127. Bollman's is the only testimony on this point, as Piscopo was not called as a witness.

    The only testimony offered by any representative of Hennessee was from Charles Gradante, one of its principals. Gradante testified that it is company policy to require written advisory agreements with all clients since "it is strongly recommended - under the Investment

7

Advisors Act- to have a written agreement." *See id*. at 138.  Gradante asserted, and it appears to be Hennessee's position in this matter, that a separate written agreement with South Cherry was not necessary because Bollman was using South Cherry as a "separate investment vehicle" and "the advisory agreement covers vehicles for which he has control." *Id*. at 138-39.  Gradante testified that his determination that Bollman invested through South Cherry Street was based on "what Craig Bollman told Leeana Piscopo," who then told him.  *Id*. at 185.  Bollman denies any such statements and, again, Piscopo, the other party to the alleged conversation, did not testify.

Gradante stated that, when the IAA was signed by Bollman in August 2001, Hennessee had never heard of South Cherry and that it did not know at that point in time that it existed or would ever exist in the future.  *See id*. at 177-79.  Gradante further admitted that he had no knowledge of the ownership structure of South Cherry and that, therefore, he could not possibly know whether Bollman was authorized to invest in hedge funds on behalf of South Cherry or to retain Hennessee.  *See id*. at 180-81.  Finally, Gradante admitted that there was no separate written or oral agreement with South Cherry and that he had never met or spoken to Groothius.  *See id*. at 139.  It is uncontroverted that Piscopo was the only individual with authority at Hennessee who had dealt with Groothius.  Gradante testified that he was not aware of any conversation between Groothius and Piscopo concerning the need to keep a bright line between South Cherry's investments and those of Proteus.  *See id*. at 141.  Again, Groothius testified to that conversation and Piscopo was not called as a witness.  Gradante also stated that Piscopo never advised him that Groothius was the decision-maker for South Cherry.  *See id*. at 143.  Finally, during his testimony, Gradante relayed a conversation he had had with Bollman at a cocktail party at his apartment during which Bollman allegedly said, "Think about  Proteus and

South Cherry as one and the same entity." *Id*. at 142.  Bollman denied having that conversation. *See id*. at 191.

Hennessee introduced into evidence its "ACT notes" on the Bollman account for the period November 1, 2000 through December 21, 2005.  *See* Ex. T.  The "ACT system" is a software program utilized by Hennessee that allows client service representatives to record events or contacts with clients chronologically so that everyone at the company is able to see what is going on with a client relationship.  *See id*. at 154.  As Gradante pointed out, however, while all material conversations should be entered, each client service representative must make his or her own judgments concerning what information should be documented in the ACT system.  *See id*.  Because almost all of the entries during the relevant time period were made by Piscopo, who did not testify, there is nothing in this record from which I can find  that the exhibit reflects all of the conversations Piscopo had with Bollman and with Groothius.

Exhibit U is a ten line document consisting of Hennessee Group's ACT notes on Fred Groothius.  What is significant about Exhibit U, other than the cross reference to Bollman's account, is the final line of the document which states, "ID/Status-client," which could be read as an indication that Groothius was a client of Hennessee separate from Bollman.

### Analysis

Section 4 of the Federal Arbitration Act authorizes a district court to compel arbitration of any matter that is the subject of a written agreement to arbitrate.  *See* 9 U.S.C. § 4.  Because arbitration is a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960).  However, a nonsignatory may, under certain circumstances, be

bound by an obligation to arbitrate. Ordinary principles of contract and agency dictate when an arbitration agreement may be enforced against a party in the absence of a signature. *See Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993). The Second Circuit recognizes five theories under which a non-signatory party may be bound to an arbitration agreement: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel. *See Thomson-CSF, S.A. v. American Arbitration Assoc.*, 64 F.3d 773, 776 (2d Cir. 1995). The party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence the existence of an agreement to arbitrate. *See United States v. Stein*, ___ F.Supp.2d ___, No. 06 Civ. 5007, 2006 WL 2556076, at *8 (S.D.N.Y. Sept. 6, 2006).

Hennessee contends that, in signing the IAA, Bollman was acting as South Cherry's agent and, therefore, South Cherry is bound to the arbitration agreement. "[W]hether an agency relationship exists 'depends on the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'" *Cabrera v. Jakabovitz*, 24 F.3d 372, 387 (2d Cir. 1994) (quoting Restatement (Second) of Agency § 1 cmt. b (1958)). The authority for an agent to act on behalf of a principal may be either actual or apparent. *See Dover Ltd. v. A.B. Watley, Inc.*, 423 F.Supp.2d 303, 318 (S.D.N.Y. 2006).

"Actual authority arises from a manifestation of consent from principal to agent," which "can be either express or implied from 'the parties' words and conduct as construed in light of the surrounding circumstances.'" *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Intern., Inc.*, 758 F.Supp. 908, 919 (S.D.N.Y. 1991) (quoting *Riverside Research Inst. v. KMGA, Inc.*,

108 A.D.2d 365, 489 N.Y.S.2d 220, 223 (1st Dep't 1985)).  Actual authority "exists only where

the agent may reasonably infer from the words or conduct of the principal that the principal has

consented to the agent's performance of a particular act."  *Minskoff v. Amer. Express Travel

Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996).

"Apparent authority . . . is normally created through the words and conduct of the

principal as they are interpreted by a third party, and cannot be established by the actions or

representations of the agent."  *Id*.  "[A] principal may be estopped from denying apparent

authority if (1) the principal's intentional or negligent acts, including acts of omission, created an

appearance of authority in the agent, (2) on which a third party reasonably and in good faith

relied, and (3) such reliance resulted in a detrimental change in position on the part of the third

party."  *Id*.

Here, there is no evidence in the record to prove that Groothius conferred actual authority

upon Bollman to act as South Cherry's agent for investing in hedge funds through Hennessee.

Groothius and Bollman both testified that neither South Cherry nor SCSIC authorized Bollman,

in writing or otherwise, to make investments on South Cherry's behalf.  Indeed, Bollman

specifically testified that, at the time he signed the IAA, he did not believe that he had authority

to bind South Cherry or to act on its behalf.  Moreover, the testimony reveals that Bollman was

not an employee of South Cherry or SCSIC.  Groothius testified and Bollman confirmed that the

extent of Bollman's agency relationship with South Cherry was to make investment

recommendations.  While Bollman made many recommendations to Groothius based on advice

he had received from Hennessee, which may very well constitute a breach of the IAA's non-

disclosure provision, it is undisputed that Groothius was the sole decision-maker with respect to

South Cherry's investments.  Accordingly, this Court has no basis on which to find that Bollman had actual authority to sign the IAA on behalf of South Cherry.

Hennessee also asserts that Bollman had apparent authority to act on behalf of South Cherry and that, therefore, South Cherry is bound by the IAA's arbitration clause.  As explained above, apparent authority is created through the words and conduct of the principal, in this case, South Cherry through Groothius.  Hennessee, however, has failed to put forth any evidence to show that Groothius conveyed to it in any manner that Bollman had authority to bind South Cherry to the IAA.  In fact, the evidence reveals just the opposite.  According to Groothius's testimony, which is uncontradicted on this point, he explained to Leeana Piscopo that there needed to be a "bright line" between Bollman and South Cherry and that any investments made by South Cherry were not being made by Bollman or any of his entities.  According to Gradante, neither Piscopo nor Groothius communicated to him this understanding.  His testimony establishes that his belief that Bollman was authorized to make investments on behalf of South Cherry was based solely on the words and conduct of Bollman.  In fact, he testified that his understanding was based on "what Craig Bollman told Leeana Piscopo."  Tr. at 185.  Gradante also provided testimony about his own interactions and conversations with Bollman.  To the extent Bollman conveyed to Gradante that he was investing through South Cherry, this is not sufficient to create apparent authority.  It is a well-settled principle of agency law that, "[w]hile agents are often successful in creating an appearance of authority by their own acts and statements, such an appearance does not create apparent authority." *Karavos Compania Naviera S. A. v. Atlantica Export Corp.*, 588 F.2d 1, 10 (2d Cir. 1978).  Moreover, the fact that fees owed to Hennessee by South Cherry were paid out of a Proteus bank account does not establish

12

apparent authority.  Although Groothius signed the checks, he did so in his capacity as an agent

of Proteus.  This, therefore, does not constitute an action of Groothius as a principal sufficient to

create the appearance of authority in Bollman to bind it to the IAA.  In the absence of any

evidence showing that Groothius, either through explicit communication or omissions, created

the appearance of authority in Bollman to make investments on behalf of South Cherry, this

Court should conclude that South Cherry cannot be bound to the IAA's arbitration clause based

on a finding of an agency relationship.

Finally, in making these findings, this Court draws an inference against Hennessee from

its failure to call Leeana Piscopo.  She is the one person from Hennessee who knew what, if

anything, Groothius authorized Bollman to do on South Cherry's behalf with respect to hedge

fund investments.  Such an adverse inference is appropriate as one would reasonably expect her

testimony to favor Hennessee's position and Hennessee bears the burden on this motion.  *See id*.

## Conclusion

Based on the foregoing, it is respectfully recommended that your Honor find that

Bollman was not an authorized agent of South Cherry and lacked authority to bind South Cherry

to the IAA, which contained the arbitration clause.

## Notice

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Rule 72(b), Fed. R. Civ .P., the

parties shall have ten (10) days, plus an additional three (3) days, pursuant to Rule 6(e), Fed. R.

Civ. P., or a total of thirteen (13) working days, (*see* Rule 6(a), Fed. R. Civ. P.), from the date

hereof, to file written objections to this Report and Recommendation.  Such objections, if any,

shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The

Quarropas Street, White Plains, New York 10601.

Failure to file timely objections to the Report and Recommendation will preclude later appellate review of any order to judgment that will be entered by Judge McMahon. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), cert. denied 113 S. Ct. 825 (1992); *Small v. Secretary of H.H.S.*, 892 F.2d 15,16 (2d Cir. 1989) (*per curiam*); *Wesolek v. Canadair, Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988). Requests for extensions of time to file objections must be made to Judge McMahon and should not be made to the undersigned.

Dated:    White Plains,  New York
          October 18, 2006

                                        Respectfully submitted,

                                        _____
                                        Mark D.  Fox
                                        United States Magistrate  Judge


Copies of the foregoing have been sent via ECF to the following:

The Honorable Colleen McMahon, U.S.D.J.

Ted Poretz, Esq.
Bingham McCutchen LLP
309 Park Avenue
New York, New York  10922

Lawrence Fenster, Esq.
Bressler, Amery and Ross
17 State Street,  34th Floor
New York,  New York 10004