# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

IN RE BAYOU HEDGE FUND INVESTMENT                06 MDL 1755(CM)
LITIGATION


-------------------------------------------------------------------X

THIS DOCUMENT RELATES TO:

-------------------------------------------------------------------X

SOUTH CHERRY STREET, LLC,

                              Plaintiff,

                                                   **REPORT AND**
            -against-                              **RECOMMENDATION**
                                                   **06 Civ. 2943(CM)(MDF)**

HENNESSEE GROUP, LLC, ELIZABETH LEE
HENNESSEE, and CHARLES A. GRADANTE,

                              Defendants.

-------------------------------------------------------------------X

TO:    THE HONORABLE COLLEEN McMAHON, U.S.D.J.

        Pending before the Court is Defendants' motion to stay the above captioned action and

to compel arbitration to resolve the differences between the parties.  This matter was referred to

me by your Honor's August 23, 2006 order for a report and recommendation concerning the

existence or non-existence of, and the scope of, any agency relationship between South Cherry

Street, LLC ("South Cherry") and Craig Bollman.

        As directed in your Honor's order of reference, this Court conducted a hearing on

September 21, 2006 for the purpose of finding the facts necessary to enable the Court to

determine what Bollman's relationship was to South Cherry and whether South Cherry Street

1

can fairly be said to have been acting through Bollman in his execution of the Investment

Advisory Agreement ("IAA" or the "agreement"), which contained the arbitration clause at

issue. Your Honor had determined, based upon review of the papers submitted on this

application, that testimony from Bollman; Fred Groothius, the principal of South Cherry; and

Charles Gradante, a defendant in this action and principal of defendant Hennessee Group, LLC

("Hennessee"), was necessary to decide the issue presented. The hearing testimony was

completed on September 21, 2006. Although the parties were given an opportunity to submit

further factual and legal arguments on the limited issue before me, both sides declined to do so.

### Factual Findings

As an initial matter, I note that the position taken by South Cherry on this application,

denying that it was bound by the IAA, appears to be inconsistent with its position in the

complaint, at least to the extent that the complaint's breach of contract claim is based on the

IAA. Of course, that issue is not before me and it may well be that there is another agreement or

theory of liability between the parties that has not been brought to my attention.

The following summarizes the evidence presented at the September 21, 2006 hearing:

South Cherry was formed in October 2000 for the purpose of acquiring a tenancy-in-

common interest in HH Resorts Joint Venture. *See* Tr. at 11-12.[1]  Craig Bollman, who Plaintiff

refers to as its "agent" in the complaint, owned a controlling interest in Aristek Western

Properties ("Aristek"). *See id.* at 103. Aristek, in turn, owned an interest in HH Resorts Joint

Venture, which it subsequently transferred to Proteus Associates ("Proteus"), also controlled by

Bollman. *See id.* at 14, 103. Proteus then made a "loan" to South Cherry by selling to it its

---

[1]  Tr. refers to pages of the transcript of hearing held on September 21, 2006.

tenant-in-common interest in exchange for a promissory note in the amount of $14,750,000, upon which Proteus was to receive installment payments over a period of years. *Id.* at 135. As Bollman explained, this loan was not "a loan in the conventional sense of Proteus having . . . assets and loaning them." *Id.* As a result of this transaction, Proteus is a secured creditor of South Cherry. *See id.* at 135-36. Fred Groothius, a certified public accountant and tax advisor for Bollman and Proteus, *see id.* at 19, owns a 99% interest in South Cherry, *see id.* at 79. The remaining 1% is owned by South Cherry Street Investment Corporation ("SCSIC"), a Subchapter S corporation wholly owned by Groothius. *See id.* Groothius has check signing authority on the Proteus bank account. *See id.*

According to Groothius, South Cherry was established "to create an installment sales obligation, in a tax legal way . . . that would allow the installment sale reporting of the gain inherent in those properties, which was practically the entire amount of the $14 million." *Id.* at 16. From a tax perspective, the benefit to Bollman in structuring the South Cherry transaction in this fashion was to defer tax liability for the funds until each installment payment was made. *See id.* at 28-29. In order to secure the tax advantage, it was important to keep a "bright line" between Bollman and South Cherry. *Id.* at 29, 54. According to Groothius, "the tax structure is . . . dependent upon South Cherry Street being independent from Mr. Bollman." *Id.* at 28.

While paragraph 12 of the complaint states that Bollman was South Cherry 's "agent," at the hearing, Groothius testified that Bollman was an agent only in the "colloquial sense" and that he "was authorized to do nothing on behalf of South Cherry." *Id.* at 20. When asked what made him a "colloquial agent," Groothius replied, "In the sense that, that he would look at investment opportunities, that then he might make recommendations to me; in that sense of the word, he was

3

an agent." *Id.* at 20-21. He further stated that Bollman never made investments directly on behalf of South Cherry. *See id.* at 22-23.  Bollman, however, made more than twenty investment recommendations to Groothius over a five-year period, some of which Groothius acted upon and others which he did not. *See id.* at 24.

Bollman confirmed that, on August 4, 2001, he signed the IAA, which contained the arbitration clause. *See* Ex. O.[2] At the time he signed the agreement, he did not understand that he had any authority to bind South Cherry or that he was acting on its behalf. *See* Tr. at 115, 121. The opening paragraph of the IAA states that it is between Hennessee and

> Mr. Craig Bollman; and all other entities, that may invest in hedge funds, for which Mr. Craig Bollman is authorized under the terms of any applicable plan, trust, partnership agreement or other governing instrument and by any applicable law to retain Hennessee and to make investments in hedge funds (collectively "Client").

Ex. O. Exhibit B to the IAA, dated  August 4, 2001[3] and entitled "Accredited Investor Status," sets forth twelve descriptions of "Accredited Investors" as defined in the Securities Act of 1933 Rule 501(a) and asks the maker to initial those that apply to the Client. *Id.* Bollman checked off two categories, both of which identify him as an individual investor with a certain specified income and net worth. *See id.* More significantly, he did not initial any category relating to a corporation or entity, even one in which all of the principals were themselves "Accredited Investors." *See id.*; Tr. at 133-34. In the "Accredited Investor Profile," attached as Exhibit C to the IAA and executed on August 4, 2001, Bollman identified himself as the sole decision maker

---

[2] Citations to exhibits refer to items admitted into evidence at the September 21, 2006 hearing.

[3] The 2002 date on the document was in error and was corrected to read 2001 at the hearing. *See* Tr. at 114.

4

with respect to hedge fund investments and further stated that he would be investing only on behalf of himself and no one else. *See* Ex. O; Tr. at 133-34. Notably, this appendix to the IAA discloses no relationship with any entity on whose behalf Bollman is authorized to "retain Hennessee to make investments in hedge funds." Ex. O.

Pursuant to the IAA, Bollman received investment advice from Hennessee and, through Proteus, invested in hedge funds recommended by Hennessee, including Sage Opportunity Fund. *See* Tr. at 111. However, according to Bollman and Groothius, Proteus's investment was separate from the investments made by South Cherry. Groothius was aware of the existence of the written IAA and he saw an unsigned copy, but never a signed copy. *See id.* at 21.

Both Groothius and Bollman testified that there was no document by which South Cherry or SCSIC authorized Bollman, individually or through an entity, to retain Hennessee or to invest in hedge funds for South Cherry. *See* Tr. at 82, 131. Both witnesses also stated that Bollman had never made any such investments for South Cherry. *Id.* Additionally, Groothius testified that Bollman had never been an employee of either South Cherry or SCSIC. *See id.* at 79-80, 130. Bollman, as an owner of Proteus, "was an indirect secured creditor" of South Cherry. *Id.* at 115. He discussed hedge fund investments with South Cherry and disclosed to Groothius the investment recommendations made by Hennessee. *See id.* at 116-17. South Cherry ultimately made investments in the following hedge funds recommended by Hennessee: West Broadway Partners, Cobalt Partners, Bricoleur Partners II, and Bayou Accredited Fund. *See id.* at 22, 30. According to the uncontradicted testimony of Bollman and Groothius, South Cherry's decision to invest in these funds was made by Groothius. *See id.* at 17, 133-34. It is worth noting that, while Bollman's sharing of Hennessee's investment advice with Groothius and South Cherry

5

may have violated the non-disclosure of proprietary information provision of the IAA, *see* Ex. O at p. 10, there is no question that all of the fees to which Hennessee was entitled due to purchases made by South Cherry were paid, *see* Tr. at 154.    I further note that the subscription agreement for the purchase by Proteus of an interest in Sage Opportunity Fund was signed by Craig Bollman.    *See* Ex 2; Tr. at 84.    Moreover, the subscription agreements for South Cherry's investments in Cobalt Partners, West Broadway Partners, and Bayou Accredited Fund all bear Groothius's signature.[4]    *See* Exs. 3-5; Tr. at 85 -89.    The subscription documents, however, went directly to the various fund managers and Hennessee did not routinely receive copies.    *See* Tr. at 183-84.

At the hearing, Groothius explained that the person with whom he exclusively dealt at Hennessee was an analyst by the name of Leeana Piscopo.[5]    *See id.* at 25.    In 2000, Piscopo was a Senior Research Analyst for Hennessee whose main responsibility was client servicing.    *See id.* at 140.    By 2003, she was listed by Hennessee as a Vice President and Company Compliance Officer.    *See id.* at 174.    According to Groothius, he explained to Piscopo in August of 2001 the need for maintaining "a bright line" between Bollman and South Cherry.    *See id.* at 30.    He testified that she understood "that I [Groothius] owned South Cherry Street and that . . . these investments were not being made by Mr. Bollman or by any entity that Mr. Bollman owned or controlled."    *Id.*    Groothius further stated that he conferred with Piscopo about every fund before

---

[4]    The subscription documents for South Cherry's investment in Bricoleur Partners II were not admitted into evidence.

[5]    Although there was significant testimony by Groothius of his conversations with Leeana Piscopo and some of her computer note entries were admitted into evidence, she was not called as a witness by either party.    No explanation for her absence was given in response to my inquiry as to whether she would be called to the stand.

investments were made. *See id.* at 25, 31, 34.

For the hedge fund purchases made by South Cherry, fees of 1% of the purchases were billed by invoices sent to Bollman, which were then paid by checks drawn on Proteus's account and signed by Groothius, who had check signing authority on that account. *See id.* at 62. On these checks, Groothius made an entry memo "South Cherry LLC" to direct the bookkeeper to charge the fee back to South Cherry. *See id.* at 64. Groothius, however, never notified Piscopo or anyone else at Hennessee that the investments in question belonged to South Cherry and not to Bollman or Proteus. *See id.* at 62-63, 76.

On December 6, 2000, Bollman attended a presentation by Hennessee regarding investment opportunities. *See id.* at 105. Prior to the presentation, Bollman had never mentioned South Cherry's existence to anyone at Hennessee and did not mention South Cherry at the presentation. *See id.* at 107, 109. However, Bollman testified that, after September 1, 2001, when Proteus invested in Sage Opportunity Fund, he disclosed to Hennessee, specifically to Leeana Piscopo, that some of the hedge funds listed to his account with Hennessee were actually owned by South Cherry and that some subsequent investments would most likely be made by South Cherry. *See id.* at 122-23; Ex. 2. Bollman also told Piscopo, on a number of occasions, that Groothius was his accountant and described to her what Groothius's responsibilities were at South Cherry. *See* Tr. at 127. Bollman's is the only testimony on this point, as Piscopo was not called as a witness.

The only testimony offered by any representative of Hennessee was from Charles Gradante, one of its principals. Gradante testified that it is company policy to require written advisory agreements with all clients since "it is strongly recommended - under the Investment

Advisors Act- to have a written agreement." *See id.* at 138. Gradante asserted, and it appears to be Hennessee's position in this matter, that a separate written agreement with South Cherry was not necessary because Bollman was using South Cherry as a "separate investment vehicle" and "the advisory agreement covers vehicles for which he has control." *Id.* at 138-39. Gradante testified that his determination that Bollman invested through South Cherry Street was based on "what Craig Bollman told Leeana Piscopo," who then told him. *Id.* at 185. Bollman denies any such statements and, again, Piscopo, the other party to the alleged conversation, did not testify.

Gradante stated that, when the IAA was signed by Bollman in August 2001, Hennessee had never heard of South Cherry and that it did not know at that point in time that it existed or would ever exist in the future. *See id.* at 177-79. Gradante further admitted that he had no knowledge of the ownership structure of South Cherry and that, therefore, he could not possibly know whether Bollman was authorized to invest in hedge funds on behalf of South Cherry or to retain Hennessee. *See id.* at 180-81. Finally, Gradante admitted that there was no separate written or oral agreement with South Cherry and that he had never met or spoken to Groothius. *See id.* at 139. It is uncontroverted that Piscopo was the only individual with authority at Hennessee who had dealt with Groothius. Gradante testified that he was not aware of any conversation between Groothius and Piscopo concerning the need to keep a bright line between South Cherry's investments and those of Proteus. *See id.* at 141. Again, Groothius testified to that conversation and Piscopo was not called as a witness. Gradante also stated that Piscopo never advised him that Groothius was the decision-maker for South Cherry. *See id.* at 143. Finally, during his testimony, Gradante relayed a conversation he had had with Bollman at a cocktail party at his apartment during which Bollman allegedly said, "Think about  Proteus and

8

South Cherry as one and the same entity." *Id.* at 142. Bollman denied having that conversation. *See id.* at 191.

Hennessee introduced into evidence its "ACT notes" on the Bollman account for the period November 1, 2000 through December 21, 2005. *See* Ex. T. The "ACT system" is a software program utilized by Hennessee that allows client service representatives to record events or contacts with clients chronologically so that everyone at the company is able to see what is going on with a client relationship. *See id.* at 154. As Gradante pointed out, however, while all material conversations should be entered, each client service representative must make his or her own judgments concerning what information should be documented in the ACT system. *See id.* Because almost all of the entries during the relevant time period were made by Piscopo, who did not testify, there is nothing in this record from which I can find that the exhibit reflects all of the conversations Piscopo had with Bollman and with Groothius.

Exhibit U is a ten line document consisting of Hennessee Group's ACT notes on Fred Groothius. What is significant about Exhibit U, other than the cross reference to Bollman's account, is the final line of the document which states, "ID/Status-client," which could be read as an indication that Groothius was a client of Hennessee separate from Bollman.

## Analysis

Section 4 of the Federal Arbitration Act authorizes a district court to compel arbitration of any matter that is the subject of a written agreement to arbitrate. *See* 9 U.S.C. § 4. Because arbitration is a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). However, a nonsignatory may, under certain circumstances, be

9

bound by an obligation to arbitrate. Ordinary principles of contract and agency dictate when an arbitration agreement may be enforced against a party in the absence of a signature. *See Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993). The Second Circuit recognizes five theories under which a non-signatory party may be bound to an arbitration agreement: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel. *See Thomson-CSF, S.A. v. American Arbitration Assoc.*, 64 F.3d 773, 776 (2d Cir. 1995). The party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence the existence of an agreement to arbitrate. *See United States v. Stein*, ___ F.Supp.2d ___, No. 06 Civ. 5007, 2006 WL 2556076, at *8 (S.D.N.Y. Sept. 6, 2006).

Hennessee contends that, in signing the IAA, Bollman was acting as South Cherry's agent and, therefore, South Cherry is bound to the arbitration agreement. "[W]hether an agency relationship exists 'depends on the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'" *Cabrera v. Jakabovitz*, 24 F.3d 372, 387 (2d Cir. 1994) (quoting Restatement (Second) of Agency § 1 cmt. b (1958)). The authority for an agent to act on behalf of a principal may be either actual or apparent. *See Dover Ltd. v. A.B. Watley, Inc.*, 423 F.Supp.2d 303, 318 (S.D.N.Y. 2006).

"Actual authority arises from a manifestation of consent from principal to agent," which "can be either express or implied from 'the parties' words and conduct as construed in light of the surrounding circumstances.'" *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Intern., Inc.*, 758 F.Supp. 908, 919 (S.D.N.Y. 1991) (quoting *Riverside Research Inst. v. KMGA, Inc.*,

108 A.D.2d 365, 489 N.Y.S.2d 220, 223 (1st Dep't 1985)).  Actual authority "exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act." *Minskoff v. Amer. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996).

"Apparent authority . . . is normally created through the words and conduct of the principal as they are interpreted by a third party, and cannot be established by the actions or representations of the agent." *Id.*  "[A] principal may be estopped from denying apparent authority if (1) the principal's intentional or negligent acts, including acts of omission, created an appearance of authority in the agent, (2) on which a third party reasonably and in good faith relied, and (3) such reliance resulted in a detrimental change in position on the part of the third party." *Id.*

Here, there is no evidence in the record to prove that Groothius conferred actual authority upon Bollman to act as South Cherry's agent for investing in hedge funds through Hennessee. Groothius and Bollman both testified that neither South Cherry nor SCSIC authorized Bollman, in writing or otherwise, to make investments on South Cherry's behalf.  Indeed, Bollman specifically testified that, at the time he signed the IAA, he did not believe that he had authority to bind South Cherry or to act on its behalf.  Moreover, the testimony reveals that Bollman was not an employee of South Cherry or SCSIC.  Groothius testified and Bollman confirmed that the extent of Bollman's agency relationship with South Cherry was to make investment recommendations.  While Bollman made many recommendations to Groothius based on advice he had received from Hennessee, which may very well constitute a breach of the IAA's non-disclosure provision, it is undisputed that Groothius was the sole decision-maker with respect to

11

South Cherry's investments.  Accordingly, this Court has no basis on which to find that Bollman had actual authority to sign the IAA on behalf of South Cherry.

Hennessee also asserts that Bollman had apparent authority to act on behalf of South Cherry and that, therefore, South Cherry is bound by the IAA's arbitration clause.  As explained above, apparent authority is created through the words and conduct of the principal, in this case, South Cherry through Groothius.  Hennessee, however, has failed to put forth any evidence to show that Groothius conveyed to it in any manner that Bollman had authority to bind South Cherry to the IAA.  In fact, the evidence reveals just the opposite.  According to Groothius's testimony, which is uncontradicted on this point, he explained to Leeana Piscopo that there needed to be a "bright line" between Bollman and South Cherry and that any investments made by South Cherry were not being made by Bollman or any of his entities.  According to Gradante, neither Piscopo nor Groothius communicated to him this understanding.  His testimony establishes that his belief that Bollman was authorized to make investments on behalf of South Cherry was based solely on the words and conduct of Bollman.  In fact, he testified that his understanding was based on "what Craig Bollman told Leeana Piscopo."  Tr. at 185.  Gradante also provided testimony about his own interactions and conversations with Bollman.  To the extent Bollman conveyed to Gradante that he was investing through South Cherry, this is not sufficient to create apparent authority.  It is a well-settled principle of agency law that, "[w]hile agents are often successful in creating an appearance of authority by their own acts and statements, such an appearance does not create apparent authority."  *Karavos Compania Naviera S. A. v. Atlantica Export Corp.*, 588 F.2d 1, 10 (2d Cir. 1978).  Moreover, the fact that fees owed to Hennessee by South Cherry were paid out of a Proteus bank account does not establish

apparent authority.  Although Groothius signed the checks, he did so in his capacity as an agent of Proteus.  This, therefore, does not constitute an action of Groothius as a principal sufficient to create the appearance of authority in Bollman to bind it to the IAA.  In the absence of any evidence showing that Groothius, either through explicit communication or omissions, created the appearance of authority in Bollman to make investments on behalf of South Cherry, this Court should conclude that South Cherry cannot be bound to the IAA's arbitration clause based on a finding of an agency relationship.

Finally, in making these findings, this Court draws an inference against Hennessee from its failure to call Leeana Piscopo.  She is the one person from Hennessee who knew what, if anything, Groothius authorized Bollman to do on South Cherry's behalf with respect to hedge fund investments.  Such an adverse inference is appropriate as one would reasonably expect her testimony to favor Hennessee's position and Hennessee bears the burden on this motion.  *See id.*

## Conclusion

Based on the foregoing, it is respectfully recommended that your Honor find that Bollman was not an authorized agent of South Cherry and lacked authority to bind South Cherry to the IAA, which contained the arbitration clause.

## Notice

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Rule 72(b), Fed. R. Civ .P., the parties shall have ten (10) days, plus an additional three (3) days, pursuant to Rule 6(e), Fed. R. Civ. P., or a total of thirteen (13) working days, (*see* Rule 6(a), Fed. R. Civ. P.), from the date hereof, to file written objections to this Report and Recommendation.  Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The

Quarropas Street, White Plains, New York 10601.

Failure to file timely objections to the Report and Recommendation will preclude later appellate review of any order to judgment that will be entered by Judge McMahon. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), cert. denied 113 S. Ct. 825 (1992); *Small v. Secretary of H.H.S.*, 892 F.2d 15,16 (2d Cir. 1989) (*per curiam*); *Wesolek v. Canadair, Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988). Requests for extensions of time to file objections must be made to Judge McMahon and should not be made to the undersigned.

Dated:    White Plains, New York
          October 1?, 2006

                              Respectfully submitted,

                              _____
                              Mark D. Fox
                              United States Magistrate Judge


Copies of the foregoing have been sent via ECF to the following:

The Honorable Colleen McMahon, U.S.D.J.

Ted Poretz, Esq.
Bingham McCutchen LLP
309 Park Avenue
New York, New York  10922

Lawrence Fenster, Esq.
Bressler, Amery and Ross
17 State Street,  34th Floor
New York,  New York 10004

# Exhibit E

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

IN RE BAYOU HEDGE FUND INVESTMENT
LITIGATION                                                    06 MDL 1755 (CM)

_____x

THIS DOCUMENT RELATES TO:

_____x

SOUTH CHERRY STREET, LLC,

                Plaintiff,                                   *06 CV 2943 (CM)(MDF)*

        -against-

HENNESSEE GROUP, LLC, ELIZABETH LEE
HENNESSEE, and CHARLES A. GRADANTE,

                Defendants.

_____x


MEMORANDUM ORDER DENYING MOTION BY
DEFENDANTS TO STAY THIS ACTION AND TO
COMPEL ARBITRATION

McMahon, J.:

        The court has reviewed the Report and Recommendation of The Hon. Mark D. Fox,
U.S.M.J., delivered on October 18, 2006; the objections thereto filed by Defendants on
November 6, 2006; and the response to those objections filed by Plaintiff on November 21, 2006.

        The Report contains the learned Magistrate Judge's Findings of Fact and Conclusions of
Law concerning the relationship between South Cherry and one Craig Bollman, who signed an
Investment Advisory Agreement with defendant Hennessee Group LLC, and who recommended
investments to South Cherry. Magistrate Judge Fox held a hearing into this issue at the court's
direction (See Memorandum Order dated August 23, 2006, which is incorporated into this order
by reference).

        For the reasons detailed in his Report, Magistrate Judge Fox concluded that Bollman was

not acting as South Cherry's agent when he signed the Investment Advisory Agreement.

Judge Fox concluded that there was no evidence that South Cherry had ever authorized Bollman, orally or in writing, to make investments on South Cherry's behalf; that Bollman was not an employee of South Cherry; and that, while Bollman did on occasion recommend investments to South Cherry's principal, Fred Groothius (who happened to be Bollman's accountant), Groothius made all the decisions for South Cherry. For these reasons, Judge Fox concluded that he had no basis on which to find that Bollman had actual authority to sign the Investment Advisory Agreement on behalf of South Cherry.

Judge Fox also concluded that Bollman did not have apparent authority to bind South Cherry when he signed the agreement. The record is barren of evidence that Groothius conveyed to defendants that Bollman had authority to bind South Cherry; indeed, the testimony of Charles Gradante, Hennessee principal and one of the named defendants, revealed that he had no knowledge that South Cherry existed! Neither side called as a witness Leeana Piscopo, a Hennessee employee to whom Bollman allegedly spoke; Magistrate Judge Fox drew an adverse inference against Hennessee from its failure to call Piscopo as a witness, and properly so, since if Bollman conveyed authority to bind South Cherry to anyone at or about the time he signed the Investment Advisory Agreement, he did so to Piscopo, not Gradante or anyone else at Hennessee.[1]

If Judge Fox's findings of fact and conclusions of law were adopted by the court, I would have to conclude that South Cherry was not a party to the arbitration agreement in the Investment Advisory Agreement, and would deny the underlying motion to compel arbitration.

Defendants objected to Judge Fox's conclusions on the following grounds:

**Actual Authority**: Both Groothius and Bollman testified that Bollman had no actual authority to make investments on behalf of South Cherry – his only role was to make recommendations, with Groothius making the final decision in every case. Defendants claim that this testimony in incredible, in light of certain documentary evidence. They point to Exhibit 7, a multi-page document relating to investments made by South Cherry through MJ Whitman. They argue that the last two pages of Exhibit 7 establish, on their face, that Bollman had actual authority to act on behalf of South Cherry. Those pages consist of two letters – one from Groothius and one from Bollman – authorizing South Cherry's bank to wire $1 million in funds to MJ Whitman to fund an investment by South Cherry. Defendants argue that these letters demonstrate that Bollman was exercising actual authority over South Cherry's assets, because Bollman's letter "authorized" the transfer of South Cherry's funds for the purpose of investing

---

[1] I disagree completely with Hennessee's argument that no adverse inference is warranted because Piscopo is no longer a Hennessee employee. Since the uncontroverted evidence (including Gradante's testimony) established that Piscopo was the ONLY person associated with Hennessee who could controvert Bollman's testimony if that testimony were false, it was up to Hennessee – the party with the burden of proving that South Cherry is a party to the arbitration agreement – to obtain that testimony, by subpoena if necessary.

those funds with MJ Whitman. And they further argue that, because these letters were dated the same day that South Ferry made its first investment in a hedge fund through Hennessee Group (not Bayou, but another hedge fund, West Broadway), one must conclude that Bollman was acting as South Cherry's actual agent when he signed the Investment Advisory Agreement.

There are two problems with Defendants' argument.

First, Bollman's "authorization" of the South Cherry investment can be explained by evidence that does not suggest any agency relationship between Bollman and South Cherry. The relationship between South Cherry and Proteus, Bollman's wholly-owned corporation, is rooted in a tax avoidance strategy devised for Bollman by his accountant, Groothius. Pursuant to the tax avoidance transaction between South Cherry and Proteus, Proteus/Bollman became a secured creditor of South Cherry to the tune of $1 million – a substantial sum of money. Exhibit 7 does not establish that Bollman had any control over South Cherry's investments: the actual wire transfer instructions came from Groothius, not Bollman (Bollman's letter to the bank said as much), and Proteus' status as a secured creditor of South Cherry explains why Bollman's authorization might have been required before South Cherry could make so substantial an investment (there is, unfortunately, no testimony on the point).

Second, these letters say nothing about who made the decision to invest in MJ Whitman (or in Bayou, or in any other hedge fund). The arbitration clause whose application is here at issue purports to bind Bollman and "all other entities that may invest in hedge funds for which Mr. Bollman is authorized under the terms of any applicable plan, trust, partnership agreement or other governing instrument and by any applicable law to retain Hennessee and to make investments in hedge funds........" Nothing in either letter at the end of Exhibit 7 indicates that Bollman was authorized, under the terms of any document or law, to retain Hennessee on South Cherry's behalf, or to make investments in hedge funds on South Cherry's behalf. Indeed, it appears that South Cherry was required to make the investment, since Groothius directed the wire transfer.

Defendants are correct that Bollman did not identify Proteus, his own investment vehicle (through which Bollman apparently made an investment in a hedge fund – albeit not Bayou – on Hennessee's recommendation) when he filled out the Investment Advisory Agreement. Perhapsy he should have done so. But one cannot infer from Bollman's silence about *his own* wholly-owned investment vehicle, over which he clearly has control, that Bollman must also have had control over Groothius' investment vehicle, in which Bollman had no ownership interest whatever. Defendants' argument is a complete non sequitur.

I thus agree with the learned Magistrate Judge that the evidence does not support a finding that Bollman had actual authority over South Cherry's investments.

**Apparent Authority**: Defendants also argue that South Cherry conferred apparent authority on Bollman to sign the Investment Advisory Agreement (and agree to the arbitration clause). This issue is harder to analyze.

As Judge Fox correctly observed, only the act or omissions of a principal can create the appearance of authority – not the acts of the purported agent, no matter how convincing. Karavos Compania Naviera S.A. v. Atlantic Export Corp., 588 F. 2d 1, 10 (2d Cir. 1978). Therefore, the evidence that needs to be analyzed on this point is evidence concerning the acts and omissions of Groothius, not Bollman.

The evidence adduced at the hearing certainly established an intertwined relationship between Bollman and Groothius and their respective investment vehicles. It also established that South Cherry was aware of the intertwining.

For example, Groothius (the accountant) testified that he was authorized to sign Proteus checks – i.e., that he was an actual agent of Proteus. That fact does not, of course, give rise to the conclusion that Bollman was authorized to enter into contracts on behalf of South Cherry – i.e., that Bollman was an agent of South Ferry. The one does not necessarily follow from the other.

The hearing evidence established that, despite the purported need to keep a "bright line" between South Cherry and Proteus for tax reasons, there were a number of instances in which the "line" was anything but "bright." For example, Bollman received invoices on behalf of South Cherry as well as Proteus, and some of those invoices showed South Cherry investments as belonging to Bollman. Of course, any error in this regard was made by Hennessee, not by South Cherry; yet Groothius admitted that he never advised Hennessee that these investments were not Bollman's, or told defendant to correct its records. Proteus paid at least one 2001 invoice relating to a South Cherry investment in an entity called West Broadway, and Groothius used a Proteus check – with Bollman's name on it – to pay a 2003 fee in connection with that same investment. Groothius also sent an email to Piscopo in May 2004, requesting a summary of "the fee structure of all the funds *we* are currently in, especially Bayou and the fee arrangement with Hennessee."

All of this suggests that there was an unusually close relationship between this particular accountant and his clients; that they invested together (the only fair import of the phrase "all the funds *we* are currently in"); and even that funds belonging to one entity were occasionally used to pay th debts of another entity. It even suggests that the tax strategy Groothius devised was not necessarily consistent with the facts. But whether Bollman is entitled to his tax advantage is not the issue here. The question for this court is whether the evidence fairly suggests that Bollman was authorized to enter into a contract on behalf of South Cherry.

I agree with the learned magistrate judge that the answer is no. The evidence might suggest to Hennessee that Groothius could act on behalf of Bollman, but there is nothing in this evidence suggesting that Bollman could act on behalf of Groothius/South Cherry. Certainly nothing fairly suggests that Bollman could bind South Cherry to an arbitration agreement. Nor is there any evidence in the record that Bollman authorized the investments made by South Cherry – or even that he, as opposed to Groothius, directed Hennessee to process any such investments.

Hennessee was clearly aware of both Groothius and South Cherry and the fact that they had invested in hedge funds through Hennessee. Hennessee could have had Groothius sign an

Investment Advisory Agreement, but did not. Hennessee's belief that there was no need for any such written agreement, because South Cherry was encompassed by Bollman's Investment Advisory Agreement – notwithstanding Bollman's statement in the Accredited Investor Profile that he was investing solely for his own account – is nothing more than an assumption on its part. Unfortunately for defendants, the evidence does not bear out the assumption.

Like Magistrate Judge Fox, I conclude that Bollman had neither actual nor apparent authority to bind South Cherry to the Investment Advisory Agreement with its arbitration clause – notwithstanding the fact that the complaint describes Bollman as South Cherry's "agent" for unspecified purposes. I therefore deny the defendants' motion to stay this action and to compel arbitration.

This constitutes the decision and order of the Court.

Dated: December 5, 2006

_____
U.S.D.J.

BY FAX TO ALL COUNSEL