UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE BAYOU HEDGE FUND INVESTMENT
LITIGATION

06 MD 1755 (CM)

------------------------------------------------------------

THIS DOCUMENT RELATES TO:

------------------------------------------------------------

SOUTH CHERRY STREET, LLC,

06 CV-02943 (CM)

        Plaintiff,

    -against-

HENNESSEE GROUP LLC, ELIZABETH LEE
HENNESSEE and CHARLES A. GRADANTE,

        Defendants.

## MEMORANDUM OF LAW IN OPPOSITION TO
## MOTION TO DISMISS THE AMENDED COMPLAINT

BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, New York 10022
(212) 705-7000

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 3

I.  THE SECTION 10(B) AND RULE 10B-5 CLAIMS ARE PLEADED WITH
    PARTICULARITY .......................................................................................... 3

    A.  South Cherry Identified the Who, What, When, Where and Why of
    Defendants' Fraud ...................................................................................... 3

        1.  The Misrepresentations are Clearly Pleaded ............................................ 4

        2.  The Sources of each Misrepresentation Are Identified in the
        Amended Complaint ................................................................................ 6

        3.  The Amended Complaint Pleads the Factual Basis for Concluding
        that Hennessee Group's Representations to South Cherry Were
        False ....................................................................................................... 6

    B.  South Cherry's Factual Allegations Give Rise to a Strong Inference of
    *Scienter* ..................................................................................................... 8

II.  THE CONTROL PERSON LIABILITY CLAIMS ARE PLEADED WITH
    PARTICULARITY .......................................................................................... 11

III.  SOUTH CHERRY PROPERLY PLEADS LOSS CAUSATION AND THERE IS
    NO INTERVENING CAUSE ........................................................................... 12

    A.  Loss Causation ........................................................................................... 12

    B.  Intervening Cause ...................................................................................... 14

IV.  SOUTH CHERRY PROPERLY PLEADS THE ELEMENTS OF A CLAIM FOR
    BREACH OF CONTRACT ............................................................................. 15

    A.  The Amended Complaint Satisfies all the Requirements for a Breach of
    Contract Claim ........................................................................................... 15

    B.  Defendants' Argument that the Contract Is Barred By the Statute of
    Frauds is Wrong ......................................................................................... 15

        1.  The Contract Is Not Indefinite ............................................................... 15

        2.  South Cherry Has Not Pleaded a Contract for the Payment of a
        Finder's Fee, the Negotiation of a Business Opportunity or
        Partnership Interest ................................................................................ 17

V.  THE MARTIN ACT DOES NOT PREEMPT THE BREACH OF FIDUCIARY
    DUTY CLAIM ................................................................................................ 18

VI.  THE AMENDED COMPLAINT PLEADS A DUTY TO PERFORM INITIAL
    AND ONGOING DUE DILIGENCE .............................................................. 19

CONCLUSION ..................................................................................................... 20

i

## TABLE OF AUTHORITIES

Page

### FEDERAL CASES

*Checknan v. McElroy*, 313 F. Supp. 2d 270 (S.D.N.Y 2004)..............................10

*Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301 (S.D.N.Y. 1996)..................9, 10

*Dietrich v. Bauer*, 126 F. Supp. 2d 759 (S.D.N.Y. 2001)..............................11, 12

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ..........................12

*EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865 (3d Cir. 2000) ...........................13

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) .................................3, 9, 20

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169
(S.D.N.Y. 2000) ..........................................................................3, 10

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)..............................13

*Louros v. Kreicas*, 367 F. Supp. 2d 572 (S.D.N.Y. 2005) .................................19

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) .................................11

*Rosbach v. Industry Trading Co.*, 81 F. Supp. 2d 522 (S.D.N.Y. 2000) ....................16, 17

*S.E.C. v. Treadway*, 430 F. Supp. 2d 293 (S.D.N.Y. 2006)..................................19

*Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87 (2d Cir.
2001) ..........................................................................13

*United Magazine Co. v. Murdoch Magazines District, Inc.*, 146 F. Supp. 2d 385
(S.D.N.Y. 2001) ..........................................................................17

*In re Veeco Instruments, Inc. Sec. Litigation*, 235 F.R.D. 220 (S.D.N.Y. 2006) ...............6

*Vivendi Universal, S.A. v. Liberty Media Corp.*, No. 02 Civ. 5571(RJH), 2004
WL 876050 (S.D.N.Y. Apr. 22, 2004)..........................................................11

*Weiss v. Tenney Corp.*, 47 F.R.D. 283 (S.D.N.Y. 1969) ......................................9

*Xpedior Creditor Trust v. Credit Suisse First Boston*, 341 F. Supp. 2d 258
(S.D.N.Y. 2004) ..........................................................................15

*Yonofsky v. Wernick*, 362 F. Supp. 1005 (S.D.N.Y. 1973)..................................18

**TABLE OF AUTHORITIES**

Page

**STATE CASES**

*Klein v. Smigel*, 44 A.D.2d 248, 354 N.Y.S.2d 117 (1st Dep't 1975)................................17

Plaintiff South Cherry Street, LLC ("South Cherry"), by its attorneys, Bingham McCutchen LLC, hereby submits its Memorandum of Law in opposition to the motion of defendants Hennessee Group LLC ("Hennessee Group"), Elizabeth Lee Hennessee ("E. Hennessee") and Charles A. Gradante ("Gradante") (collectively, "Defendants") to dismiss the Amended Complaint.  For the reasons set forth below and in the accompanying Declaration of Fred Groothuis (the "Groothuis Decl."), the motion to dismiss must plainly be denied.

## INTRODUCTION

In their continuing effort to avoid having to explain to South Cherry the basis on which they recommended a sizable investment in the Bayou Accredited Fund ("Bayou"), Defendants allege a laundry list of purported defects in the Amended Complaint.  Among their assertions, Defendants claim that the Amended Complaint is insufficiently particular, that it does not plead loss causation, that it does not set forth the common law elements of a contract,  that it violates the Statute of Frauds and that as a matter of fact, it falsely imputes to Defendants statements and representations that they never made.

As discussed in more detail below, Defendants miss the mark widely in every one of these claims.  As to their first two grounds, a review of the Amended Complaint will show that it pleads Defendants' false statements in great detail, identifies the source of each statement, and establishes the factual basis for South Cherry to have concluded that the statement or promise was false.  Beyond the information that Defendants possess -- which they have vigorously sought to shield from the discovery of their South Cherry victims – it is difficult to imagine what other averments South Cherry might add.

Defendants' discussion of loss causation, though seemingly grounded in the leading authority, utterly misses the point.  Here, Defendants recommended the purchase of a hedge fund security that was then – and long before – a criminal Ponzi scheme whose value simply could

never have approached the price Defendants induced South Cherry to pay for it.[1]  Unlike the

publicly-traded securities in the leading cases (whose value was determined by the open

marketplace), which lost their value for reasons unrelated to the false statements alleged (and

long before the false statements were discovered), South Cherry's investment – at the very

instants the investments were made – could not have been remotely equivalent to the value of the

functioning and successful hedge fund that Defendants told South Cherry it was.[2]

Finally, Defendants are simply wrong when they assert that South Cherry's common law

claims have not been properly pleaded.  The Amended Complaint does not violate the Statute of

Frauds for indefiniteness, it does not plead a claim for a "finder's fee" and it clearly establishes

not only that a contract was established but also that Defendants undertook continuing

contractual obligations to South Cherry to perform ongoing due diligence on Bayou.

Underpinning every one of the grounds to Defendants' motion is Gradante's Declaration

(the "Gradante Decl.") in which Gradante swears under penalty of perjury that the Amended

Complaint cites documents that do not exist containing representations Defendants never made.

Defendants have now written to the Court to acknowledge that such representations in

Hennessee Group documents do exist, but they assert, puzzlingly, that this does not alter a thing

and they do not withdraw the Gradante Decl. from the record.  The documents to which the

Amended Complaint referred are attached to the accompanying Groothuis Decl. and provide the

documentary basis for the representations attributed to them.

---

[1]  Defendants do not assert that South Cherry has failed to adequately describe the criminal frauds
of Bayou and its management, instead seeking to use them as a sword. The Court is referred to the
Amended Complaint for a detailed description of the Bayou fraud, and may take notice of the fact Your
Honor is scheduled to sentence Bayou's principals, Samuel Israel III, Daniel Marino and James Marquez,
on their criminal pleas in the weeks ahead.

[2]  Hedge funds hold securities, and the value of a hedge fund is a function of the value of its
holdings.  Where, as here, the hedge fund is not investing and has diverted its investors' assets to the
personal accounts of the hedge fund's principals, the hedge fund has no value.

At the end of the day, the Amended Complaint is more than sufficient to meet South Cherry's burden of pleading that Defendants made a series of representations about Bayou that were not true, that the representations were based on promised due diligence that Defendants simply did not conduct, and that at an absolute minimum, Defendants buried their heads in the sand when confronted with the falsity of their statements or even the opportunity to verify them.

The Amended Complaint is more than sufficient. The motion to dismiss should be denied.

## ARGUMENT

In deciding this motion to dismiss, the Court must accept as true all well-pleaded allegations. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000). As demonstrated below, South Cherry has sufficiently pleaded claims for securities fraud, breach of fiduciary duty, breach of contract and control person liability.

I.    **THE SECTION 10(B) AND RULE 10B-5 CLAIMS ARE PLEADED WITH PARTICULARITY**

     A.    **South Cherry Identified the Who, What, When, Where and Why of Defendants' Fraud**

Defendants correctly set forth the standard for pleading a claim alleging violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(j) and Rule 10b-5 promulgated thereunder, and there is no need to argue about it here. In short, to satisfy the pleading requirement, South Cherry must set forth "[t]he who, what, where, when and why" of the alleged misrepresentations. *See Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169, 174 (S.D.N.Y. 2000). The Amended Complaint clearly satisfies the particularity requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u (the "PSLRA") and Fed R. Civ. P. 9(b).

3

1.    **The Misrepresentations Are Clearly Pleaded**

The Amended Complaint's statement of Defendants' misrepresentations are straightforward, detailed, often quoted directly from a Hennessee Group written document, and not subject to misinterpretation.  Among the misrepresentations alleged are these:

- "Hennessee group described its 'unique due diligence process' in detail, underlining its importance to any hedge fund investor.  This process was described as having five separate levels, that it evaluated all candidate hedge funds after each level of hedge fund review, and that a hedge fund would have to pass all five levels of due diligence review before Hennessee Group would ever recommend the hedge fund to a client.  If the hedge fund did not pass any single level of the five level process, it would not be passed on to the next level of inquiry, and accordingly could not be recommended to a client under any circumstances.  There were certain bottom line requirements for a hedge fund even to enter the five level due diligence process.  One of these was the requirement that the hedge fund must have 'three years audited track records' in order to be eligible to enter the first level...." (Am. Compl. ¶ 15.)

- "For those hedge funds that passed the first level of due diligence review, Level Two of the Hennessee Group due diligence process included, among other things, an assessment of the hedge fund's 'experience,' and 'credibility,' and also sought to assess its 'transparency....'" (*Id.* ¶ 16.)

- "For those hedge funds passing Level Two review, Level Three review required, among other things, a face-to-face meeting at the hedge fund's offices so that Hennessee Group personnel could 'interact with [hedge fund] Personnel from the top down to develop an impression of overall professionalism, attitude and depth of organization' and to help Hennessee Group assess the hedge fund's 'systems,' 'training,' 'risk management,' 'personnel,' 'culture,' 'environment' and 'organization' and 'philosophy.'" (*Id.* ¶ 17.)

- "For those hedge funds that survived Level Three due diligence, Hennessee Group represented that at Level Four, it studied the hedge fund's 'individual positions,' with an emphasis on its long, short, cash and derivative positions, as well as any 'off balance sheet transactions.'  Level Four due diligence also required a review of the 'beta, market capitalization and trade days of portfolio....'" (*Id.* ¶ 18.)

- "Finally, for those hedge funds which made it past the first four levels of due diligence...a candidate hedge fund must also pass yet another level of review. Hennessee Group's fifth level required a review of 'audited financial statements,' as well as a reference check for the hedge fund's key personnel, confirmation of the hedge fund's prime banking relationship, and contact with the prior employers of the fund's key employees.  Hennessee Group also promised that it would

4

'verify' the hedge fund auditors." (*Id.* ¶ 19.)

- "In recommending an investment in Bayou to South Cherry, Hennessee Group represented in writing to Groothuis and South Cherry, among other things that the predecessor Bayou Fund had been launched in January, 1997, that it had a greater than 19% annualized return since inception, that it was profitable in 78% of the months since its inception, and that it had accomplished all of this at relatively low risk relative to the broader marketplace." (*Id.* ¶ 26.)

- "Hennessee Group represented to South Cherry that Bayou, and the other Bayou Family Funds, were audited by [Hertz, Herson & Co.], a fact intended to buttress the credibility of these funds to knowledgeable investors." (*Id.* ¶ 23.)

- "As part of its investment recommendation to Groothuis and South Cherry, Hennessee Group also provided South Cherry with six years of written monthly performance figures for Bayou Fund. Net of all fees, Hennessee Group represented to South Cherry that Bayou Fund's annual performance between 1997 and 2002 ranged from a 7.05% gain in 2001 to a 21.04% gain in 1999 to a high water gain of 32.52% in 1997." (*Id.* ¶ 28.)

- "Hennessee group also prepared and provided to Groothuis and South Cherry a purported written 'Biography' of Bayou's 'Founder and Principal,' Israel. Among other things, the Hennessee Group 'Biography' of Israel represented that 'from 1992 to 1996,' Israel was 'head trader for Omega Advisors, managing assets exceeding $4 billion for Leon Cooperman' and that at Omega,  Israel 'was responsible for all equity and financial futures execution, and shared responsibility for hedging the portfolio using futures and options." (*Id.* ¶ 29.)

- "On February 6, 2003, Hennessee Group's Piscopo -- a person described on Hennessee Group's Form ADV as a 'control person' -- emailed Groothuis with additional information on Bayou.  Among other things, this email advised Groothuis and South Cherry that Bayou follows '250 stocks in the universe that they look at daily,' that Bayou 'will have 50+ investment ideas and because many times they don't get their target price, they only put on 20-30 trades in one day,' that they 'rarely use any leverage at all,' and 'employ stop-loss orders on all securities that they [Bayou] trade." (*Id.* ¶ 31.)

- "…Hennessee Group represented that it conducted a 'disciplined,' 'On-Going Due Diligence' process which, it represented was 'equally important' to the pre-investment due diligence process.  Among other things, Hennessee group's 'on-going due diligence' scrutinized the hedge fund's performance figures and it continued to review audited financial statements on a continuing basis. The process particularly looked for 'style drift' - any variation from plan in a hedge fund's investment activities." (*Id.* ¶ 20.)

- During the period of South Cherry's investment in Bayou, "Hennessee Group mailed regular monthly reports, entitled 'Manager Performance Monitor' to

Groothuis at South Cherry, which confirmed South Cherry's belief that Hennessee Group was conducting the on-going due diligence it promised. Just before Bayou's fraud was discovered, Hennessee Group reported to South Cherry that its $1.15 million had appreciated to approximately $1.5 million." (*Id.* ¶ 33.)

2.   **The Sources of each Misrepresentation Are Identified in the Amended Complaint**

None of the misrepresentations set forth above are pleaded on information and belief. All or most of them are simply quotations from documents sent to Groothuis by Hennessee Group, and the documents in which the misrepresentations were made are clearly identified. In one case, the Amended Complaint quotes detailed statements made in an email sent to Groothuis by a Hennessee Group control person, Piscopo.

The Amended Complaint need not identify the individual authors of the documents sent by Hennessee Group to South Cherry, and indeed, such information is likely to be in the unique possession of Defendants. Where allegedly false and misleading information is distributed through press releases or group published information, it is reasonable to presume that the statements are collectively those of the principals and/or control persons of the company, and indeed of the company itself. *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232-33 (S.D.N.Y. 2006) (plaintiffs may rely on presumption under group pleading doctrine that those involved in daily operations of business were authors of statements distributed by company).

3.   **The Amended Complaint Pleads the Factual Basis for Concluding that Hennessee Group's Representations to South Cherry Were False**

The gravamen of the Amended Complaint is simply that Defendants defrauded South Cherry by representing that before recommending the Bayou investment to South Cherry, Hennessee Group had conducted a great deal of very specific due diligence about Bayou that it simply did not do. While the precise contours of Hennessee Group's due diligence is known only to Hennessee Group, the Amended Complaint clearly shows that Hennessee Group did not,

6

and could not have performed key aspects of its promised due diligence.

Thus, for example, the Amended Complaint shows that Hennessee Group could not have assessed Bayou's "credibility" or "transparency," as pleaded in paragraph 16, "its overall professionalism, attitude and depth of organization," as set forth in paragraph 17, or studied Hennessee Group's 'individual [trading] positions with an emphasis on its long, short, cash and derivative positions…" based on the Securities and Exchange's finding that starting "shortly after [Bayou's] inception in 1996…[Israel and Marino] 'began lying to investors regarding the Fund's performance and the value of investors' accounts. Defendants Israel and Marino also began to misappropriate and dissipate millions of dollars of investor monies from the Fund and, beginning in 2003, the four successor Funds.'" (Am. Compl. ¶ 31.)[3]

Hennessee Group could not have reviewed Bayou's audited financial statements, as alleged in paragraph 19, because the Bayou entity in which South Cherry invested did not exist for three years at the time of the investment (*id.* ¶ 27), because the only auditor a Bayou hedge fund ever had hired, Hertz Herson & Co., was fired in 1998 (*id.* ¶ 23), and because the purported auditor of Bayou thereafter, Richmond Fairfield Associates, was a fake entity at all relevant times (*id.* ¶ 23) that did no actual auditing and that in any event was controlled by Bayou's principal Marino (a fact publicly available to anyone caring to look), which meant that even if it tried to audit Bayou, it could not do so independently (*id.* ¶ 24). For the same reasons, Hennessee Group's written representation to South Cherry that Hertz Herson & Co. continued to audit Bayou (*Id.* ¶ 23) is false.

The "Biography" of Israel that Hennessee Group circulated was not only untruthful – Israel was never the head trader of Omega and never managed $4 billion in assets, as Omega's

---

[3] The Amended Complaint, at paragraph 32, pleads that South Cherry made its first investment in Bayou on March 3, 2003.

principal has publicly stated (*id.* ¶ 30) – Hennessee Group's promise to conduct a "reference check" and "contact…the prior employers of the fund's key employees" (*id.* ¶ 19) could not have been true, given the statement of Omega's principal.

All of Hennessee Group's representations about Bayou's prior performance (*id.* ¶ 28), its annualized returns (*id.* ¶ 26) and its trading strategies (*id.* ¶ 31) are shown false in light of the SEC's findings that Bayou was unprofitable from the start (*id.* ¶¶ 28, 31, 34, and 35, among other places).

Finally, Hennessee Group could not have conducted any of its promised on-going due diligence and yet continued to circulate glowing monthly performance results for Bayou in light of the SEC's finding that Bayou had become a Ponzi scheme which lost money in every year it traded (*id.* ¶ 28), and its related finding that as of April 2004, Bayou stopped trading any securities at all and instead misappropriated Bayou's remaining assets to its principals (*id.* ¶ 35).

In that light, it is simply not true that South Cherry faults Defendants merely for failing to discover Bayou's fraud before the criminal authorities and securities regulators did.  The Amended Complaint clearly accuses Defendants of committing their own fraud: representing to South Cherry that it had taken specified, clearly described steps to investigate Bayou before recommending it, and additional investigatory steps thereafter, which it simply did not do. Knowing as we now do just what the Bayou fraud consisted of, there should be very little question but that if Hennessee Group and its principals had done anything remotely like what it promised South Cherry, South Cherry would not have invested in Bayou.

## B.  South Cherry's Factual Allegations Give Rise to a Strong Inference of *Scienter*

It is true that South Cherry is required to plead facts giving rise to a strong inference of *scienter*.  It is also true that the Amended Complaint sufficiently does so.

"'Malice, intent, knowledge, and other condition of mind of a person may be averred generally.'" *Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1312 (S.D.N.Y. 1996) (*quoting Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). "All that is required under Rule 9(b) is that there exist a 'minimal factual basis for . . . conclusory allegations of scienter.'" *Id.* at 1312 (*quoting Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994)). Fraudulent intent may be inferred by identifying circumstances indicating conscious or reckless behavior by the Defendants. *Id.* (*citing Shields*, 25 F.3d at 1128). While "speculation and conclusory allegations will not suffice," the Second Circuit does not "require great specificity provided the plaintiff alleges enough facts to support a strong inference of fraudulent intent." *Ganino*, 228 F.3d at 169.

As discussed in detail above, the Amended Complaint contains a great number of factual allegations showing that Defendants intended to defraud South Cherry by representing that it was very familiar with Bayou based on the detailed due diligence it had conducted and would continue to conduct when Defendants had done little or none of it. Pleading *scienter* is not difficult here: Defendants knew what they had promised South Cherry and others, and they knew what they had done and failed to do. Yet year after year, Defendants continued to represent to South Cherry that it was continuing to monitor Bayou, that Bayou was trading successfully and making large profits, all at a time when Bayou was not trading at all and was instead siphoning off investors' assets into the private accounts of Bayou's principals. Defendants' continued misrepresentations over a period of years – facts pleaded in the Amended Complaint – is just another indication of Defendants' *scienter*. *E.g. Weiss v. Tenney Corp.*, 47 F.R.D. 283, 292 (S.D.N.Y. 1969) ("[T]he element of scienter is more easily inferrable [sic] and proven from the existence of a continuous course of conduct....").

As set forth above, the Amended Complaint describes in detail all of the many deficiencies in Bayou that any reasonable due diligence would have uncovered. Hennessee Group has failed in too many of its promised due diligence obligations in too blatant and consistent a manner for this to be described as merely an oversight. The only reasonable inference to be drawn from all of these facts is that Defendants made no effort to live up to their promises to South Cherry to conduct both pre-investment and post-investment due diligence according to the very specific and detailed steps they represented they would take. *See Checknan v. McElroy*, 313 F. Supp. 2d 270, 274 (S.D.N.Y 2004) ("On a motion to dismiss, the factual allegations contained in the complaint are accepted as true, and the plaintiff given the benefit of all reasonable inferences.").

The Amended Complaint presents "strong circumstantial evidence of conscious misbehavior which amply satisfies both Rule 9(b) and the PSLRA." *Hallwood Realty Partners*, 95 F. Supp. 2d at 174 (denying motion to dismiss for failure to plead any misstatement with sufficient particularity, including *scienter*); *Degulis*, at 1311-13 (same). If Defendants did conduct *any substantial portion* of the due diligence they promised, only willful blindness to the ongoing Ponzi scheme would permit Defendants to represent that Bayou was a highly profitable hedge fund and thus to recommend its investment to South Cherry (and many others).

Given the level of detail of alleged wrongdoing pleaded by South Cherry, and the compelling inferences to be drawn from Defendants' failure to conduct due diligence of Bayou, thus feeding a massive, ongoing criminal fraud, coupled with its continued recommendation of Bayou as an investment, the Court can readily draw a strong inference of conscious wrongdoing. It is for discovery to ferret out why the defendants did this.

NYDOCS/1290182.2

II.    **THE CONTROL PERSON LIABILITY CLAIMS ARE PLEADED WITH PARTICULARITY**

In this Circuit, "the 'control person' provisions are broadly construed as they 'were meant to expand the scope of liability under the securities laws.'" *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001) (*quoting Terra Res. I v. Burgin*, 664 F. Supp. 82, 88 (S.D.N.Y. 1987)). "For purposes of Section 20(a) liability, actual control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof." *Id.*

South Cherry has alleged E. Hennessee and Gradante's role in supporting the fraud with sufficient particularity.[4] *See Novak v. Kasaks*, 216 F.3d 300, 303, 306 (2d Cir. 2000) (reversing dismissal for lack of particularity because District Court placed "exceedingly onerous burden on the plaintiffs with respect to their obligation to plead facts with particularity"); *Vivendi Universal, S.A. v. Liberty Media Corp.*, No. 02 Civ. 5571(RJH), 2004 WL 876050, at *9 (S.D.N.Y. Apr. 22, 2004) ("[A]llegations allowing a reasonable inference that the alleged controlling person had the potential power to influence and direct the activities of the primary violator sufficed to state a claim for controlling person liability.") (internal quotations omitted).

There can be no question that both E. Hennessee and Gradante are control persons within the meaning of the statute. They admit as much in Hennessee Group's Form ADV. (Am. Compl. ¶ 59). E. Hennessee and Gradante are both Managing Principals of Hennessee Group (*id.* ¶¶ 3-4.) – a small company any relevant time. Both were direct supervisors of Piscopo, who dealt most closely with Groothuis and South Cherry. The Amended Complaint pleads that E. Hennessee and Gradante were in overall charge of Hennessee Group's due diligence process (*id.* ¶ 59), which necessarily includes the due diligence conducted of Bayou, and which leads to the necessary conclusion that they were individually responsible both for Hennessee Group's

---

[4] As described in Section I, *supra*, there is no question that a primary violation of federal securities laws was alleged and occurred.

11

failures to perform the due diligence operations it promised and for its fraudulent misrepresentations and omissions to South Cherry that it had done so and would continue to do so.

Under all the circumstances, the Amended Complaint contains more than sufficient particularity to give rise to an inference that Hennessee and Gradante "either knew of or were willfully blind to the fraud." *Dietrich*, 126 F. Supp. 2d at 766-68 (denying control person's motion for summary judgment on control person liability claim where jury could conclude that control person knew or should have known of primary fraud).

III.    **SOUTH CHERRY PROPERLY PLEADS LOSS CAUSATION AND THERE IS NO INTERVENING CAUSE.**

A.    **Loss Causation**

Defendants' argument that South Cherry failed to plead loss causation simply misconstrues clear authority. Defendants' Memorandum in Support of the Motion to Dismiss (the "Memo.") properly defines loss causation, but utterly misapplies the doctrine to the clearly pleaded facts of the Amended Complaint.

The loss causation rule simply states that "a plaintiff must prove that the damage suffered was a foreseeable consequence of the misrepresentation," – in other words, it is proximate cause in the context of securities fraud. (Memo. at 13 (*quoting Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992); *see also Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

This is precisely what South Cherry has done. South Cherry alleges that *at the time it made each of its investments in Bayou,* it was investing in a security that *at that time* was not worth what South Cherry paid to invest in it. (Am. Compl. ¶ 33.) The Amended Complaint alleges that at the time of each of South Cherry's investments in Bayou, Bayou was not a

12

genuine security, profiting on the purchase and sale of securities, but a criminally fraudulent Ponzi scheme. (*Id.* ¶¶ 7, 9, 33, 35, 370). Defendants cannot, with a straight face, claim that on any of the days South Cherry invested in Bayou, its investment had any genuine value, let alone the value of the investment. Thus, South Cherry suffered damages at virtually the instant of each Bayou investment it made.

In the seminal case of *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005), the market price of the publicly traded securities in which plaintiffs invested sunk long before there was any allegation of fraud in defendant's recommendation to purchase those securities. As a result, the Second Circuit properly reasoned that defendant's recommendation could not have been the reason plaintiffs lost money.

That is not what happened here. Because the Bayou investment was a criminal fraud long before South Cherry invested in its securities – securities that are not designed to trade on an open and liquid marketplace as *Lentell's* were – there should be little question but that South Cherry overpaid for its Bayou investment. Its investment in Bayou was, unlike *Lentell's* investments in internet stocks, instantly worth less than a purchase price that was predicated on the false notion that Bayou was a genuine hedge fund, holding marketable securities, with a track record of successfully profiting from its trading strategies. Transaction causation and loss causation here took place simultaneously. *See Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 94, 96-97 (2d Cir. 2001) (finding loss causation adequately pleaded where misrepresentations created inaccurate perspective of value of investment, so that "Plaintiffs'…securities were at the time of acquisition and are today-worthless."); *see also EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865 (3d Cir. 2000) (loss causation adequately pled where plaintiff alleged it invested in a company based on false representations that the company

NYDOCS/1290182.2

was on the verge of entering into several profitable contracts, without which the investment was worthless at the time it was made).

### B.    Intervening Cause

Defendants do not escape liability because of the later discovery that Bayou was a criminal enterprise. It is ironic that Defendants would allege this as an intervening act, when, after all, they were in the business of investigating hedge funds in order to protect hedge fund investors like South Cherry from investing in fraudulent enterprises. The due diligence services Defendants promised were not important merely to check a hedge fund's resume or performance, but also to make sure that the hedge fund was legitimate, honestly run and performing as it represented. It would not have been difficult for Defendants to discover Bayou's fraud if it had done remotely what it promised to do; at a minimum, it knew, or could have found out, that Israel's resume was materially false, that Bayou's advertised auditor was not its auditor, that Bayou's actual "independent auditor" was neither independent nor an auditor nor a genuine business enterprise, that Bayou's reported performance results were false and that Bayou stopped trading securities while dozens of Hennessee Group customers continued to make Hennessee Group-recommended investments in Bayou.

While there may have been *intervening discovery* – the very job Defendants were paid to perform – there was no *intervening cause*. Bayou's criminal acts, as the Amended Complaint pleads, did not intervene because they took place long before Defendants recommended Bayou to South Cherry. Defendants should properly be embarrassed at this flimsy attempt to use their own fraudulent misconduct – their failure to perform promised due diligence – as a sword against their innocent victim investors.

NYDOCS/1290182.2

IV.    **SOUTH CHERRY PROPERLY PLEADS THE ELEMENTS OF A CLAIM FOR BREACH OF CONTRACT**

A.    **The Amended Complaint Satisfies all the Requirements for a Breach of Contract Claim**

In order to successfully plead a claim for breach of contract under New York law, South Cherry must allege the existence of an agreement, performance by South Cherry, breach by Defendants and damages, nothing more. *See Xpedior Creditor Trust v. Credit Suisse First Boston*, 341 F. Supp. 2d 258, 270-71 (S.D.N.Y. 2004). South Cherry has done this, and as set forth above, the Court is required to accept its allegations as true in ruling on Defendants' motion.

Paragraphs 45 through 50 plead that South Cherry and Hennessee Group entered into a contract whereby, in exchange for an annual fee, Hennessee Group would make suitable hedge fund recommendations that were the product of its due diligence process, that Hennessee Group did not make such recommendations, that South Cherry fully performed its obligations, and that as a result of Hennessee Group's breach, it was damaged. That is all it must do. Particularized pleading is not required to plead a common law contract claim. *Xpedior*, 341 F. Supp. 2d at 271.

B.    **Defendants' Argument that the Contract Is Barred by the Statute of Frauds Is Wrong**

On two separate grounds, Defendants assert that the Statute of Frauds (N.Y. G.O.L. § 5-701(a)) requires dismissal of South Cherry's contract claim. Both are wrong.

1.    **The Contract Is Not Indefinite**

Defendants claim that South Cherry "does not allege a termination date...and continues to reference representations allegedly made to Plaintiff through 2005 regarding Bayou and other hedge funds." (Memo. at 19.) Defendants misconstrue both the Amended Complaint and the law.

15

First, South Cherry has no obligation to plead a termination date.  Second, the only

relevant concern is whether the allegations of the Amended Complaint establish that the contract

***cannot*** be performed or terminated within one year.  *Rosbach v. Industry Trading Co.*, 81 F.

Supp. 2d 522, 526 (S.D.N.Y. 2000).  Defendants point to nothing in the Amended Complaint,

other than the absence of a specific termination date, to support this flimsy claim.  The contract –

defined in the Amended Complaint as South Cherry's agreement to pay Hennessee Group an

annual fee for each year it holds a hedge fund investment Hennessee Group recommended in

exchange for Hennessee Group's due diligence and suitable recommendation – is unquestionably

not perpetual.  Once South Cherry redeems or sells a Hennessee Group-recommended hedge

fund – which it can do at any time – it no longer owes Hennessee Group a commission.  Nothing

compels South Cherry to hold hedge funds forever.

Defendants misunderstand the legal meaning of "indefinite" as regards the duration of a

contract.

> *New York General Obligations Law* § 5-701(a)(1) encompass[es] only those
> contracts which, by their terms, have absolutely no possibility in fact and law of
> full performance within one year.  As long as the agreement may be fairly and
> reasonably interpreted such that it may be performed within a year, the Statute of
> Frauds will not act as a bar however unexpected, unlikely, or even improbably
> that such performance will occur during that time frame.

*Rosbach*, 81 F. Supp. 2d at 525 (denying motion to dismiss on Statute of Frauds grounds because

"nothing in the Complaint suggests that Defendants could not have repaid the loan within a year

from the date of the Loan Agreement") (internal quotation marks omitted).

Thus, if a contract is *capable* of being fully performed within a year, regardless of

whether it actually is or not, then its enforcement will not be barred by the Statute of Frauds.  *See*

*id*.

Here, South Cherry paid Hennessee Group a commission of 1% of each hedge fund

investment it purchased on Hennessee Group's recommendation. (Am. Compl. ¶ 45.) At any time, South Cherry could have sold its interest in Bayou. That South Cherry did not, and held its investment in Bayou for more than a year, does not mean that South Cherry could have done otherwise, the only relevant consideration. *See Rosbach*, 81 F. Supp. 2d at 525. Defendants do not argue to the contrary, relying on cases that do little more than state the black-letter proposition that contracts of indefinite duration are subject to the Statute of Frauds. *See, e.g.*, *United Magazine Co. v. Murdoch Magazines Dist., Inc.*, 146 F. Supp. 2d 385, 403-04 (S.D.N.Y. 2001) (enforcement of magazine distribution contract that by its terms could not be performed in less than a year and that contained no express provision for termination was barred by the Statute of Frauds).

2.    **South Cherry Has Not Pleaded a Contract for the Payment of a Finder's Fee, the Negotiation of a Business Opportunity or Partnership Interest**

Defendants' contention that *General Obligations Law* § 5-701(a)(10) also bars enforcement is equally unavailing. (Memo. at 20-21.) Section 5-701(a)(10) is about "finder's fees." Its purpose is to protect businessmen from a claim by an alleged finder who seeks a finder's fee without written evidence of any agreement to pay one. *See Klein v. Smigel*, 44 A.D.2d 248, 250, 354 N.Y.S.2d 117, 120 (1st Dep't 1975). It was not intended to protect a party who now self-interestedly labels itself a finder.

There is no question that the services Hennessee Group agreed to perform were different from those the Memo describes; they were not merely to "introduce[e] part[ies] to the transaction" or "assist in negotiation or consummation of a transaction." (Memo. at 20.) As pleaded, Hennessee Group not only made recommendations to South Cherry about suitability of investments – the classic function of a registered investment advisor, as Hennessee Group is – but was also selling its pre-investment and post-investment on-going due diligence services.

17

Hennessee Group agreed to take all of the steps contained in each of the five levels of due diligence it outlined in the Investor Presentation, and undertook to take additional steps after South Cherry invested. It agreed to continue to take these steps throughout the life of any investment South Cherry made on its recommendation. People who claim to be finders do nothing of this sort. They are done once a contract is signed.

This section of the Statute of Frauds is "aimed at a middleman – broker or finder – who merely arranges a transaction between two outsiders. In the situations covered by these statutes the broker or finder claims no interest in the completed transaction. All he is concerned with is a fee or commission for arranging the transaction." *Yonofsky v. Wernick*, 362 F. Supp. 1005, 1029 (S.D.N.Y. 1973) (rejecting Statute of Frauds argument because defendant had obligations beyond merely introducing the parties to a transaction).

Hennessee Group had a continuing interest in the completed transaction, because it continued to derive commission income in the years after it made its so-called introduction, and it also undertook ongoing obligations to perform due diligence for the life of the investments. Defendants were hardly being compensated for introducing South Cherry to Bayou; it undoubtedly would have done this for free. It earned its compensation for providing research, due diligence, recommendations and ongoing investigative services for years after any meeting (and there was none here) would have taken place. *General Obligations Law* § 5-701(a)(10) is simply inapplicable. Defendants' motion to dismiss the contract claim must be denied.

## V.    THE MARTIN ACT DOES NOT PREEMPT THE BREACH OF FIDUCIARY DUTY CLAIM

Defendants correctly state that the Martin Act, *General Business Law* Art. 23-A, §§ 352 *et seq.*, gives New York's Attorney General the exclusive right to investigate securities violations in New York. However, the suggestion that this precludes South Cherry's breach of a

18

fiduciary duty that is created by a federal statute, the Investment Advisers Act of 1940, 15 U.S.C.

§§ 80b-1 *et. seq.*, misapprehends the thrust of South Cherry's allegations.

The fiduciary duty cause of action stems from Defendants' contractual obligations to

perform ongoing due diligence, as promised by Hennessee Group in the Investor Presentation

sent to Groothuis, among other things. Defendants do not suggest that Hennessee Group is not

an investment advisor, and that it does not have fiduciary duties to its clients. *See S.E.C. v.*

*Treadway*, 430 F. Supp. 2d 293, 338 (S.D.N.Y. 2006) (Section 206 of the Investment Advisers

Act "establishe[d] 'federal fiduciary standards to govern the conduct of investment advisers.'"

(*quoting Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979)). It would be

meaningless for an investment advisor to have fiduciary duties to individual customers, if the

customers had no individual recourse for the breach of these duties. For precisely this reason,

courts allowed customers to file suit against their investment advisors for breach of their

fiduciary duties. *See Louros v. Kreicas*, 367 F. Supp. 2d 572, 595 (S.D.N.Y. 2005).

As in *Louros*, the Amended Complaint alleges that Defendants breached a fiduciary duty

owed to South Cherry to "keep [it] informed about the market and the trades in [its] accounts."

*Id.* at 596. Defendants did not perform ongoing due diligence, a duty it specifically undertook in

writing. As Judge Kaplan found in *Louros*, this claim does not fall within the purview of the

Martin Act, and is thus not subject to dismissal on Defendants' motion. *Id.* at 595.

VI.    **THE AMENDED COMPLAINT PLEADS A DUTY TO PERFORM**
       **INITIAL AND ONGOING DUE DILIGENCE**

This prong of Defendants' motion to dismiss rests entirely on an assertion that

Defendants should have withdrawn. Defendants are simply wrong that the Amended Complaint

does not allege both initial and ongoing duties to South Cherry. (*See* Am. Compl. ¶ 20.)

Defendants may have made this claim under the erroneous belief that they had not sent an

Investor Presentation to Groothuis that said anything about ongoing due diligence, but now that they have discovered their error, they should at least have had the grace to withdraw this profoundly false claim. The Investor Presentation that is attached to the Groothuis Decl. sets forth very specific obligations, both pre-investment and post-investment on an ongoing basis – that Defendants undertook to perform on behalf of South Cherry. These are set forth in detail in Section I, *supra* and need not be repeated here.

Defendants' reliance on *Gabriel Capital, LP v. Natwest Fin., Inc.*, 137 F. Supp. 2d 251 (S.D.N.Y. 2000), is utterly irrelevant, as this Court must accept as true all allegations made by South Cherry on this motion to dismiss. *See Ganino,* 228 F.3d at 161. There is no question but that the Amended Complaint pleads that Defendants owed South Cherry a duty to perform both initial and on-going due diligence, and whatever the point of Point VI of the Memo should be, it must be denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

Dated: New York, N.Y.
      April 27, 2007

Respectfully submitted,

/s/ Ted Poretz
Ted Poretz (TP-5387)
Bingham McCutchen LLP
399 Park Avenue
New York, N.Y. 10022
(212) 705-7412

*Attorneys for Plaintiff*

20